

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1445-16

**FRED EARL INGERSON III, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SECOND COURT OF APPEALS
### HOOD COUNTY

**HERVEY, J., delivered the opinion of the unanimous Court.**

### O P I N I O N

Appellant, Fred Earl Ingerson III, was convicted of capital murder for killing

Robyn Richter and Shawna Ferris in the same transaction. Because the State did not seek

the death penalty, he was sentenced to life imprisonment without the possibility of parole.

Ingerson appealed, in part arguing that the evidence was legally insufficient to support his

conviction. The court of appeals agreed and rendered an acquittal. *Ingerson v. State*, 508

S.W.3d 703, 704 (Tex. App.—Fort Worth 2016) (mem. op.). We agreed to review the

decision of the court of appeals and conclude that it erred in finding the evidence insufficient. Consequently, we will reverse its judgment and remand the cause for the court of appeals to address Ingerson's remaining points of error.

## BACKGROUND

In the early morning hours of June 28, 2008,[1] the bodies of Robyn Richter and her friend, Shawna Ferris, were found in Richter's vehicle outside of a Japanese restaurant and sushi bar called Miyako in Granbury. They both were shot once in the head. Almost two years later, Ingerson was arrested for capital murder and was convicted.

### A. Richter & Ingerson

Richter met Ingerson at the Hood County Tax Assessor-Collector Office in Granbury, where she handled car registrations in the Motor Vehicle Division. Ingerson was immediately smitten with Richter and asked her to go on a date with him. They developed a friendship over a two-month period, exchanging phone calls and text messages on a daily basis. Richter considered them just friends, but Ingerson was interested in a romantic relationship. Although Richter was not interested in that, she led Ingerson to believe that she was because she enjoyed being "wined and dined," and she needed money to appear more financially stable while trying to adopt a young girl. One of her co-workers and best friends warned her on multiple occasions not to lead Ingerson on, especially because she was romantically interested in another man named Mohamed

---

[1]The murders were committed in the waning hours of June 27 or in the early morning hours of June 28.

"Mo" Sylla, but she did not think that Ingerson knew Richter was using him. Ingerson's statements to police indicated otherwise.[2]

During the same time period that Richter and Ingerson became friends and began spending time together, Richter was trying to adopt a girl named S.L.[3] The problem for Richter, however, was that she did not make much money. At the end of each month, she had $194 leftover after paying her bills and other expenses. Richter told S.L. that Ingerson tried to have sexual intercourse with her and that she refused, but she also told S.L. that, even though she thought that Ingerson was disgusting, she would be nice to him so he would lend her money. About a month before the murders, Richter told one of her friends and S.L. that Ingerson had given her $10,000 to help with her adoption case. Bank records, however, showed that $10,000 was never deposited into Richter's account. The average deposit was a few hundred dollars. Days before the murders, Ingerson and Richter went to dinner, and she asked him for a $1,500 loan, but Ingerson refused.

### B. Day of the Murders

#### 1. Afternoon before the Murders

On June 27, 2008, Ingerson went to the Tax-Assessors Office to buy license plates. When he pulled out his checkbook to write a check, Richter jokingly asked if she could

---

[2]For example, Ingerson told police that he felt like a "mark" to be used by Richter and that he was only interested in being friends with Richter because he thought that she had questionable intentions.

[3]We use the pseudonym S.L. because the witness was a minor at the time the offense was committed. TEX. R. APP. P. 9.10(a)(3).

write a check out to herself. Ingerson told her no. After he left, Richter made fun of him in front of the entire staff, mocking him because he was balding, because he walked funny, and because he was a nerd. Despite making fun of him in front of her co-workers, later that evening, Richter texted Ingerson and Sylla a picture of her cleavage with the caption, "Yes they miss u 2." Ingerson responded, asking Richter if she was "bored, horny, or teasing?"

### 2. Night of the Murders

Later that evening, Richter and Ferris invited Ingerson to Miyako. He told them that he would meet them there because he needed to get ready first. Richter and Ferris arrived at Miyako between 9:15 p.m. and 9:30 p.m. They sat at the sushi bar. While they were there, they started talking to the bartender and told him that they had been spending Ingerson's money when they were out shopping earlier that day. When Ingerson arrived at about 10:00 p.m., he sat with Richter and Ferris at the sushi bar.

A number of people overheard or saw interactions between Ingerson, Richter, and Ferris that night. The manager overheard something about "relationships" and heard Ingerson shouting racial pejoratives. Ingerson's tirades were directed at Sylla, the other man Richter was seeing, because he is black, and Ingerson did not like black people. Richter had also told Ingerson that she was going to see Sylla later that night. While Richter was in the restroom, another employee overheard Ferris tell Ingerson that "it" would not be okay with her because Richter was like a sister to her, referring to a

threesome that Ingerson had previously suggested. Richter and Ferris also flirted with two other patrons at the bar, and Richter even grabbed one of the men's crotch, which he loudly noted. Ingerson chastised her, telling her to control her behavior.

Richter and Ferris left Miyako between 10:40 p.m. and 10:45 p.m., but Ingerson stayed. While the bartender was cleaning up, he saw Ingerson talking on his phone, and he thought that Ingerson was talking to Richter or Ferris. After Ingerson got off of the phone, he started talking to the manager. During that conversation, the manager noticed Richter's vehicle pull into the parking lot but that Richter and Ferris just sat in the car. After the manager saw Richter's vehicle, he told everyone to leave so they could close the restaurant. There were six people still in Miyako. Three of those people were customers and the other three worked there. All six people left the restaurant together, and Frankie Cheung, a part owner, set the alarm. That was at about 11:45 p.m. The bartender rode home with the manager, and the other three, Cheung and two bar patrons, went to look at a blown speaker in Cheung's car for a few minutes before they left. The last person to leave the parking lot except for Ingerson, Richter, and Ferris was the bartender, and he left at about 11:55 p.m. When he left, he saw Ingerson talking to Ferris at the passenger side of the vehicle. Ingerson told police that, as he was leaving Miyako, he saw Richter and Ferris, and he briefly spoke with Richter at the driver's side of the vehicle before walking over to the passenger side to talk to Ferris. According to him, he left shortly thereafter, and when he left, they were listening to "jigaboo" music.

Police later found Ingerson's palm prints on the driver's side of the car.

After Ingerson left Miyako, he called Lynn Harper, another romantic interest, at 12:16 a.m. and asked if he could come over. He used a second mobile phone to call her. Harper lived in Arlington, and Ingerson drove there from Granbury, arriving at about 1:30 a.m. According to Harper, they had talked earlier about Ingerson coming over, but they never made firm plans. She also said that Ingerson had never called her that late to come over, but that he was acting normal when he arrived. Ingerson told Harper that he was going to a car show the following morning at LaGrave Field in Fort Worth.

### 3. Subsequent Events

The day after the murders, police received a call about two people possibly passed out in a vehicle in front of Miyako. When they arrived at about 10:00 a.m., they found the bodies of Richter and Ferris. Both the driver-side and passenger-side windows were still rolled down. The women had been shot from the passenger side of the vehicle. Police noticed that Richter's phone and some cash were on the floorboard, so they ruled out robbery as a possible motive. The medical examiner concluded that Richter and Ferris could have been murdered as early as 9:00 p.m. or as late as 2:00 a.m., but he thought that some time around midnight was most likely. During their investigation, police learned that Ingerson was the last person to speak to Richter on the phone and that he was the last person to see the women alive. The last outgoing call on Richter's phone, which was to Ingerson, ended at 11:53 p.m., just before everyone left

Miyako. From 11:53 p.m. to 12:22 a.m. there was no phone activity, but beginning at 12:22 a.m., Richter received several phone calls and texts that she did not answer. Security footage from a daycare on the way from Miyako to Ingerson's house showed Ingerson driving past the turn to his house and slamming on his brakes before backing up on the highway and turning down the road to his house. Based on the video, police determined that Ingerson left Miyako as late as 12:05 a.m. because he was seen driving past the daycare at about 12:07 a.m, and it established a time frame for the murders of about 10 to 12 minutes—from when Ingerson and Richter's call ended at 11:53 p.m. to 12:05 a.m. when he was seen pulling out of the Miyako parking lot.[4]

As police were investigating the murders on June 28, and Ingerson was allegedly at a car show in Fort Worth, he was actually getting his car serviced at a Kwik Kar in Granbury. One employee remembered Ingerson because he told him that he had just broken up with a woman because of her drinking. The employee said that he remembered the conversation because he thought it was weird that Ingerson told him that. And, while servicing Ingerson's vehicle, a technician who was vacuuming the floorboards, noticed a revolver under the driver's seat. He later told police that he

---

[4]Authorities recovered Richter's mobile phone, security-camera footage from a nearby store, and security-camera footage from the daycare's security cameras. The timestamps on the security footage compared to the time when Richter's last phone call ended were different, but police were able to figure out when Ingerson left Miyako by comparing the time at the end of Richter's last conversation, the videos showing Ingerson leaving and driving by the daycare, and the timestamps on the videos. According to those comparisons, Ingerson left the Miyako parking lot at approximately 12:05 a.m., about twelve minutes after his phone call with Richter ended at 11:53 p.m.

thought it was stamped with an "S&W" for Smith and Wesson but also that it looked like a Colt .38 Special or maybe a Colt .357 Magnum. According to him, his father used to own a snub-nosed Colt .38 Special, and he said that if he saw a picture of the gun, he could identify it. He also drew a picture of the gun for police, and the picture was of a revolver with a hammer spur. But police learned during the investigation that Ingerson had owned a snub-nosed, bobbed-hammered Colt .38 Special, meaning that the hammer spur had been removed. Due to the discrepancy between the drawing and the gun police knew Ingerson had owned, they later took the Kwik Kar technician to look at guns at Cabela's, where the technician picked out a gun that looked like the one he saw in Ingerson's car. After Ingerson had his car serviced, he took a shirt and a pair of pants to a dry cleaner. Police later tested the pants and the area under the driver's seat of Ingerson's car for gunshot particle residue (GSR). Ingerson said that he had not fired a gun in over a year, but the pants had one "characteristic" particle, and three "indicative" particles of GSR. Under the driver's seat, police found one "indicative" particle of GSR.

Ingerson claimed to have first learned about the murders from his family upon returning to Harper's house after running errands on June 28. Ingerson's brother heard about the murders from the manager of Miyako, who had gone to Ingerson's house to talk to Ingerson. Ingerson's brother called Ingerson and told him about Richter and Ferris. By 6:00 p.m. that evening following the murders, everyone except Ingerson had given a statement, so an officer called Ingerson to speak with him. Ingerson called back

a few minutes later and told the officer that he was about to walk into a movie theater to see a movie. Phone records, however, show that he was at Harper's house. He eventually returned to Granbury and gave a statement at 9:00 p.m.

In processing Richter's vehicle, police found a 130-grain projectile in the backseat,[5] which was discovered to have Ferris's DNA on it. Police believed that the bullet had been fired by a Colt .38, a Colt .357, or a .38 Super Auto,[6] and they learned that Ingerson had bought a snub-nosed, bobbed-hammered .38 Special when he lived in Indiana. He later told police that he sold the gun to a "Mexican" at a South Padre Island beach while attending a car show.[7] Officers received information that the previous owner of the gun in Indiana might have fired the gun into a dirt backstop on his property and that Ingerson's ex-wife had bullets from the .38 Special Ingerson had bought because she had a friend unload the gun before she gave it back to Ingerson. Testing comparing the projectile found in the backseat of Richter's car, which had Ferris's DNA on it, to the projectiles dug up from the dirt backstop showed that the bullets from the

---

[5]Grain is a small unit of measurement used to describe the mass of an object, like a bullet.

[6]Police were looking for a Colt revolver because no spent casings were found at the crime scene and because the projectile recovered from Richter's vehicle had a left twist. The only major manufacturer that produced firearms with rifling that produced a left twist was Colt. There was no evidence that Ingerson had access to a Colt .357 or .38 Super Auto.

[7]Although there was evidence Ingerson had been to car shows at South Padre Island, there was no documentation of Ingerson's sale of his .38, nor could he describe the person he sold it to except to say that he was "Mexican." On the other hand, police examined all of Ingerson's guns at his home in Granbury and were able to trace the guns from the manufacturer to Ingerson's purchase of the gun. It was only the .38 that Ingerson was vague about owning.

dirt backstop were not fired by the same weapon used to murder Ferris. Testing comparing the bullets recovered from Ingerson's ex-wife to the one in the backseat of the car was inconclusive. Police never recovered the murder weapon.

The State Prosecuting Attorney (SPA) filed a petition for discretionary review, which we granted, asking,

> (1) In a capital case, did the two-justice panel fail to defer to the verdict, apply defunct sufficiency standards, and ignore inculpatory evidence when [Ingerson] was the last person with the victims, had been rejected by them, fled the scene, had a .38—the likely weapon, had a .38 under his car seat the day after, had gun-shot residue on his pants and car seat, and acted suspiciously?

## ARGUMENTS

### The State

The State argues that the overwhelming circumstantial evidence in this case is sufficient for a rational jury to conclude beyond a reasonable doubt that Ingerson murdered Richter and Ferris. According to it, the evidence shows that Ingerson had motive to murder Richter, that Ingerson was the last person to see Richter and Ferris alive, that Ingerson owned the type of gun and ammunition used to kill Richter and Ferris, and that Ingerson engaged in incriminating behavior after the murders. The State also directs us to the GSR evidence on Ingerson's pants and in his car.

### Ingerson

Ingerson argues that the court of appeals was correct and that this Court should dismiss the petition for discretionary review as improvidently granted or affirm the

lower court's judgment. Ingerson also accuses the SPA of mischaracterizing the record, and he contends that a true reading of the record shows that the SPA's allegations are not supported by the evidence. Namely, Ingerson contends, the evidence does not support that he and Richter were involved romantically or that he was upset or angry with Richter or Ferris prior to the murders. He also argues that there is no link between himself and the potential murder weapon, that there was no biological evidence connecting him to the murders, and that his behavior after the murders was not suspicious, claiming that he did not flee the scene or avoid police questioning.

## DISCUSSION

### The Court of Appeals

On direct appeal, a two-member panel of the Fort Worth Court of Appeals reversed the judgment of the trial court, holding that the evidence was legally insufficient to support Ingerson's conviction.[8] *Ingerson*, 508 S.W.3d at 704. The court of appeals individually summarized the testimony of over fifty witnesses before analyzing the sufficiency of the evidence. *Id.* at 704–730. The State argued that a jury could have found Ingerson guilty beyond a reasonable doubt based on eight items of

---

[8]Justices McCoy, Dauphinot, and Meier were on the panel, but Justice McCoy retired before the appeal was decided. TEX. R. APP. P. 41.1(b) ("After argument, if for any reason a member of a court consisting of only three justices cannot participate in deciding a case, the case may be decided by the two remaining justices."). Because of the unusual procedural posture, Justice Walker moved that all seven justices consider the case, but her motion was denied. *Ingerson*, 508 S.W.3d at 736–37 (Walker, J., dissenting from order denying motion to hear appeal en banc) (per curiam).

evidence. *Id.* at 732–35. The court rejected the State's reliance on each piece of evidence item-by-item, concluding that "[t]he sole and only fact proven by the State beyond a reasonable doubt is that Ingerson was the last person seen at Richter's vehicle, where the victims' bodies were found." *Id.* at 735. In finding the evidence insufficient, the court "made clear" that it considered the cumulative force of all the evidence and reasonable inferences therefrom in the light most favorable to the State. *Id.* at 736.

The eight pieces of evidence cited by the State included:

(1) Ingerson's relationship with Richter, (2) Ingerson's alleged motive to murder the victims because of Richter's disingenuous feelings towards him, (3) Ingerson's presence at the location and time of the victims' murders, (4) Ingerson's ownership of a gun of the same make and caliber as the murder weapon, (5) the presence of the gun under the driver's seat in Ingerson's vehicle the day after the murders, (6) the presence of gunshot residue under the driver's seat of Ingerson's car and on the pants Ingerson wore the night of the murders, (7) Ingerson's alleged suspicious activity following the murders, and (8) Ingerson's incriminating statements to police and others.

*Id.* at 732.

The court of appeals concluded, however, that there was no proof that Ingerson was romantically interested in Richter or that he knew that Richter was using him or ridiculing him behind his back. *Id.* The court of appeals also noted that Ingerson consistently maintained that he only wanted to be friends with Richter and that Ingerson's presence at the scene and the fact that he was the last one to see the women alive was not sufficient to prove that he murdered Richter and Ferris. *Id.* It thought that evidence that Richter inappropriately touched another man at Miyako was

inconsequential because there was no evidence that the inappropriate touching offended Ingerson. *Id.*

We agree that there is no record evidence to support that Ingerson knew Richter was making fun of him behind his back, but there is record evidence that Ingerson was romantically interested in Richter and that Ingerson knew that Richter might be using him for his money. S.L. testified that Richter told her that Ingerson tried to have sexual intercourse with her but that she refused because she thought he was disgusting, and a co-worker of Richter's said that Ingerson was interested in Richter even though Richter was not romantically interested in him. Richter told her friend that she thought Ingerson was falling in love with her. Ingerson himself told police that he thought Richter was trying to use him and that was why he made her buy her own food and drinks when they went out. The court of appeals appears to have concluded that, because no one noticed that Ingerson was visibly angry after Richter talked about Sylla and grabbed another man's crotch, he must not have been angry. But a person can be upset without visibly appearing so, and at any rate, the evidence shows that Ingerson yelled racial slurs referring to Sylla and that he told Richter to control herself after she grabbed another man's crotch.

The court of appeals also rejected the State's argument that a rational jury could have reasonably concluded that Ingerson was the murderer because he owned a gun of the same make and caliber as the murder weapon and because GSR was found under the

driver seat of Ingerson's vehicle and on his pants. *Id.* at 733–34. The court asserted that the State's "reasonable inference" was merely speculation because there were a number of possible innocent alternative explanations. *Id.* at 734. The lower court also concluded that the State actually proved that Ingerson's .38 could *not* have been the murder weapon. *Id.* According to it, because all 22 of the .38-caliber bullets recovered from the Indiana dirt backstop could not have been shot by the murder weapon, Ingerson's Colt .38 could not have been the murder weapon. *Id.* But the court of appeals overstated the case when it reached that conclusion. The bullets recovered from Indiana were not consistent with the bullet from the crime scene, but that does not prove that Ingerson's gun was not the murder weapon. The Indiana bullets could have been fired from a different gun. The previous owner said that he had shot other .38s into the dirt backstop and that, while he was sure he shot the .38 he sold to Ingerson, he might have fired it only in his backyard. The jury also did not have to believe Ingerson's implausible story that he sold his Colt .38 to a random "Mexican" on a South Padre Island beach whom he did not know and could not describe. Absent actual proof of sale, the jury could have reasonably inferred that Ingerson still owned the gun and that he was being evasive about his continued ownership of the gun.

Focusing on the GSR, the court of appeals highlighted the Kwik Kar technician's testimony that the gun he saw under the driver's seat had an "S" and "W" stamp on it and how it was not until almost a year later when police took the technician to Cabela's

where he picked the "right gun." According to that court, the technician's "testimony is the sole source of evidence about a pistol under the seat of Ingerson's vehicle. This testimony and this evidence fall short of proof beyond a reasonable doubt that the murder weapon was under the seat of Ingerson's car on June 28, 2008." *Id.* at 735. But the court of appeals dismissed the fact that there was GSR under the driver's seat of Ingerson's car and on his pants. The court also speculated that the Kwik Kar technician must have seen one of Ingerson's other guns, a .44 Smith & Wesson, and not the Colt .38 that he owned and that could have been the murder weapon. Focusing on other reasonable explanations for evidence improperly applies the abrogated reasonable-alternative-hypothesis construct. *Ramsey v. State*, 473 S.W.3d 805, 808 (Tex. Crim. App. 2015). The jury was entitled to accept or reject any part of the technician's testimony, including believing that the technician was mistaken about the "S&W" logo but that he correctly identified the gun he saw in Ingerson's car as a snub-nosed, bobbed-hammered Colt .38 at Cabela's.

The court of appeals also rejected the State's reliance on Ingerson's incriminating conduct after the murders and his incriminating statements to police. According to the court, when Ingerson said that he left Miyako around 11:00 p.m. instead of 12:00 a.m., he was merely confused. *Ingerson*, 508 S.W.3d at 735. But the jury did not have to believe Ingerson's statements of innocence or that he was confused when he originally told police that he left at 11:00 p.m. The court failed to discuss other

inconsistencies, including that Richter told people that Ingerson tried to have sexual intercourse with her, but Ingerson told police that he was interested only in being friends; that, even though Richter and Ingerson had phone contact almost every day for two months, he did not call or text her the day after she was murdered even though he allegedly did not know that Richter and Ferris had been murdered; and that Ingerson's story about the .38 Special that he bought wildly varied and was implausible.

**Analysis**

The State had to prove beyond a reasonable doubt that Ingerson intentionally or knowingly caused the deaths of Richter and Ferris in the same transaction by shooting them with a firearm. TEX. PENAL CODE § 19.03(a)(7)(A). There is no dispute that a firearm was used intentionally to murder Richter and Ferris or that they were killed during the same transaction. The issue here is identity. Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence. *See Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009). After reviewing the record, we conclude that there is sufficient evidence to sustain Ingerson's conviction when the evidence is viewed in the light most favorable to the verdict.

Ingerson knew that police were looking for a .38 Special[9] and that he owned a .38 Special, but he avoided telling police. And although Ingerson avoided telling police about his .38, he allowed them to inspect and trace every other gun he owned. When

---

[9]The projectile recovered from Richter's vehicle was .38 caliber.

police finally learned about the .38 Special and confronted Ingerson, the only story he could come up with was that he sold it to a "Mexican" he met on a South Padre Island beach. However, the jury did not have to believe that story. Instead, it could have believed that Ingerson still owned the .38 Special and was attempting to conceal it from police. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (implausible explanations and concealing evidence from police are circumstances of guilt). There was also testimony that Ingerson regularly kept guns in his car, including a .38[10] and that the Kwik Kar technician saw, what he believed was, a .38 under the driver's seat of Ingerson's vehicle when he had the car serviced the day after the murders. GSR evidence further showed that a gun under the driver's seat had recently been fired and that Ingerson lied when he told police that he had not shot a gun in a year.

The evening of the murders, Richter continued her typical behavior of leading Ingerson on while also taunting him and embarrassing him. Before Ingerson met Richter and Ferris at Miyako, Richter texted him a picture of her cleavage. But at Miyako, she told Ingerson that Sylla, who she was "head over heels" for, was coming into town and that she planned on seeing him that night even though she knew that Ingerson did not

---

[10]One of Ingerson's friends testified that he saw a gun case in the back of Ingerson's car, and Ingerson told him that there was a .38 revolver in it. The same friend testified that Ingerson regularly kept a .380 semi-automatic pistol in the center console of his car. Another witness, a woman Ingerson met at South Padre Island, said that Ingerson showed her a revolver that he kept in the back of his car.

like black people. Ingerson was also heard yelling racial slurs.[11] Also, despite Richter's knowledge that Ingerson was romantically interested in her,[12] she embarrassed him by flirting with other men at the bar, and she even grabbed another man's crotch, after which Ingerson told her that she needed to control herself. From all of this, a jury could have believed that Ingerson had a motive to kill Richter because Ingerson was angry at Richter. Motive is not an element of murder, but it is a circumstance indicative of guilt. *Id.*; *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012) (opportunity and motive are circumstances of guilt).

In addition to having a motive to kill Richter, Ingerson had the opportunity and means to do so because he was the last one to see them alive, and the jury could have believed that he still owned his .38 Special, which he kept in his car. *Merritt*, 368 S.W.3d at 526. The evidence also showed that both women were killed around midnight and that Ingerson was seen on security footage just after midnight speeding past a turn to his house even though he had lived in the same house for years and often dined at Miyako, which was only a few minutes away from his house. Having the opportunity to murder someone and then fleeing the crime scene is a circumstance of guilt, especially here where Ingerson was familiar with the area, but was nonetheless disoriented,

---

[11]Ingerson told police that Richter told him that she had a "sugar daddy" and that she told him things like Sylla was her "best friend" and that she would do "anything" for him.

[12]Richter told people that Ingerson wanted to have sexual intercourse with her, but Ingerson contradictorily told police that he was only interested in being Richter's friend.

missing the turn to his own home. *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007).

After Ingerson arrived home, he continued to act suspiciously. He called Harper at 12:16 a.m. and asked to come over, which was something he had never done at that time of night. He also told Harper that he was going to a car show the next morning, but he actually drove back to Granbury to have his car serviced and to drop off the pants he was wearing the night of the murders at a dry cleaner. Later, he did not answer calls from the police, but when the police asked Ingerson's brother to call him, Ingerson answered. After finally contacting Ingerson, Ingerson quickly made up a story that he could not give a statement because he was about to walk into a movie theater. He also told a friend who asked about Richter that "he would not be seeing her anymore," and even though Ingerson and Richter had contact via phone almost everyday for two months, he did not call or text her following the murders even though he claimed that he did not learn about the murders until later. The lie to Harper, the trip to Granbury to drop off the clothes that he wore the night of the murders for dry cleaning, his avoidance of the police, his comment to his friend, and his suspicious lack of phone activity following her murder support a rational inference of guilt together with the actual circumstances of the murders.

While each circumstance of guilt considered in isolation is insufficient to prove that Ingerson murdered Richter and Ferris, when all of the evidence is viewed in the

light most favorable to the verdict, and we consider the cumulative force of all the admitted evidence and reasonable inferences that can be drawn therefrom, we conclude that the evidence was sufficient to support the verdict.

## CONCLUSION

We reverse the judgment of the court of appeals and remand the cause for that court to address Ingerson's remaining points of error.

Delivered: September 19, 2018

Publish