

## NUMBER 13-18-00038-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

MARY ELIZABETH JACOBY,                                                   Appellant,

v.

THE STATE OF TEXAS,                                                       Appellee.

On appeal from the 77th District Court
of Limestone County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes
Memorandum Opinion by Justice Longoria**

Appellant Mary Elizabeth Jacoby was convicted of murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West, Westlaw through 2017 1st C.S.). By one issue, Mary argues that the evidence was legally insufficient to support her conviction. We affirm.

## I. BACKGROUND[1]

Raymond and Mary Jacoby were married in 1983 in Montana. The two were divorced in 2003; however, even after the divorce, Raymond employed Mary at the Mexia Recycling Center (scrapyard) that he operated in Mexia, Texas.[2] Raymond eventually met Atina Cagadas in 2009 and visited her in the Philippines multiple times. On January 12, 2011, Atina and her ten-year old daughter Sharmaine came to the United States and began living in a home at the entrance of the scrapyard with Raymond. Raymond and Atina obtained a marriage license on March 21, 2011 and planned to be wed on April 4, 2011.

Testimony from multiple friends and workers painted Mary as an "unhappy person" who deeply loathed Raymond. Robin Dabney worked at the scrapyard and testified that Mary was afraid Raymond was "going to take everything away from her." Robin also testified that Mary referred to Atina as "slut" and "fish head." Robin's wife, Kim, testified that she used to be friends with Mary. According to Kim, "if [Raymond and Mary] were both in the same room together, they were yelling and screaming." Kim further testified that sometime in late 2009 or early 2010, Mary invited Kim and Robin over for dinner and offered Robin $30,000 to kill Raymond because "he was just going to take everything from her and that she just wanted him gone." Mary offered Robin money to purchase a gun and wanted Robin to tell Mary once he killed Raymond so she could find his body.

---

[1] This case is before this Court on transfer from the Tenth Court of Appeals in Waco pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2017 1st C.S.).

[2] Because both parties refer to the Mexia Recycling Center as "the scrapyard," we will do the same.

Robin refused, and Mary responded that if he would not kill Raymond, then somebody else would.

Dennis Killy was another scrapyard employee. He testified that Raymond and Mary argued all of the time and frequently did not get along well. He averred that he used to call Mary once a month or so as friends. According to Killy, on several occasions Mary talked about how she wanted Raymond dead and how "I wish [Raymond] would die." Sometime in early 2011, Mary asked Killy if he would kill Raymond for her; Killy claims he declined. On March 30, 2011, Killy and Mary called each other thirty-three times, which Killy admitted was "very different" from how frequently they usually talked. However, Killy asserts they communicated so many times that day because Mary was very upset, for unspecified reasons. Killy also asserted that Mary told him over the phone on the morning of March 31, 2011 that she "wanted [Raymond] dead."

Gary Nichols was another scrapyard employee; he testified that one day, after a heated argument between Mary and Raymond, he saw Mary pick up a pistol and heard her say, "I'd kill that motherf***er." Riley Farris, another employee, testified that one day, when Raymond was yelling at Mary, Mary turned to Farris and declared, "I wish [Raymond] was dead."

In early 2011, Randy Wilson, another scrapyard employee, took Raymond to the airport. According to Wilson, when he returned to the scrapyard, Mary exclaimed, "I hope the f***ing airplane crashes and gets rid of our problem."

On March 31, 2011, Killy called Mary at 6:01 a.m. and 6:12 a.m. Mary asserted that the call was related to property that she was attempting to buy from Killy; Mary further claimed that Killy told her on the phone that he was currently in Dallas. However, cell

phone records indicate that both of Killy's calls originated from Mexia, Texas. Raymond received a call at 6:54 a.m. from Mary. The phone call only lasted about 34 seconds. Atina heard Raymond say, "just let me finish eating my breakfast." According to Atina, Mary was in her truck, with the engine running, at the front gate of the scrapyard. At 6:55 a.m., Raymond called Mary back, and Atina heard Raymond once again state, "just let me finish eating my breakfast." Atina testified that she resumed picking up dog poop when she heard a loud "boom." She thought it was the sound of something exploding at the scrapyard. Atina could hear Mary crying by the gate but went back to cleaning.

According to the phone records, Mary called 911 at 7:06 a.m. to report that "somebody's shot Raymond." Officers from the Mexia Police Department arrived at the scrapyard two minutes later and found Raymond next to the front gate, which was ajar. The officers testified they observed no blood or gunshot wounds on their initial arrival. Revendy Rhodes, a paramedic, noted that Raymond had no pulse and was not breathing. Rhodes asked Mary what happened, and Mary replied that she had just pulled up and saw Raymond on the ground. Rhodes did not detect blood or any bullet wound on Raymond until he was flipped over onto his back.

Mary gave the officers consent to search her residence and the scrapyard office. The officers located one pistol at Mary's desk in the office building and three more pistols from Mary's residence. One of the officers testified that he saw a rifle propped up against a window in the scrapyard's residence building, but the rifle was not recovered.

Mary was interviewed by several officers concerning the events of that day. According to Mary, she woke up at 6:20 a.m. on March 31, 2011. She called Raymond at 6:50 a.m. so she could come in to work early because she normally does not start work

4

until 7:50 a.m. She claimed she waited ten or fifteen minutes at her home until she drove down to the front gate at some point after 7:00 a.m. She testified that she noticed the gate was slightly open; she got out of her car, walked towards the gate, and then saw Raymond face down on the ground. She claimed that she asked him what happened, but he only groaned in response. Mary told the interviewers that she latched the front gate because she did not want it to hit Raymond's body. Mary asserted she called 911 twice after latching the front gate.

Maxine Spivey lives about a block away from the scrapyard. She testified that on March 31, 2011, she was waiting outside to escort her granddaughter to the school bus, which normally arrives at 7:00 a.m. As her granddaughter got on the bus, she heard a loud "boom"; at the time, she thought it was a sound from the school bus.

Lynn Salzberger, a forensic pathologist, testified that an x-ray of Raymond's torso revealed a "feature that we see with a high-powered rifle gunshot wound. Any type of high-velocity gun, the bullet will fragment and make what we call this lead snowstorm as it enters the body." According to Salzberger, high-velocity guns include hunting rifles and assault rifles. The bullet travelled straight through Raymond's heart and "beat [it] to a pulp." Salzberger testified that gunshot wounds are not typically this severe unless the gun is a high-powered rifle. Based on the exit hole in the center of Raymond's back, Salzberger opined that the shooter was likely in front of Raymond and that the shooter was elevated, Raymond was slightly bent over, or "a little bit of both."

Anne Koettel testified that she found lead residue near the exit wound but not near the entrance wound, which suggested the firearm was fired outside of the "drop-off distance." In other words, she opined the gun was not likely shot at point-blank range.

5

Vicki Hall, an expert in gunshot residue, testified that she analyzed the results from the gunshot residue kits administered to Raymond, Atina, and Mary. Hall testified that Mary's and Atina's kit samples were collected using the atomic absorption method, which involves using a cotton swab; Raymond's kit sample was collected using the scanning electron microscope ("SEM") method, which involves a "sticky stub" that is dabbed on the surface being tested. According to Hall, the increased presence of three elements together—antimony, barium, and lead—is characteristic of gunshot residue. If only two of the elements are present, such as increased levels of lead and antimony but not barium, then the result would be "consistent with gunshot residue but [it] might be from environmental sources as well." For example, Hall testified that a combination of lead and antimony might occur as a result of coming into contact with a lead weight or old lead paint, a combination of barium and lead can mean that person handled a car battery, and "[b]arium is very common in dirt and soils, clays, potteries, that type of material. So, it's not uncommon for a person that has very dirty hands to have a higher level of barium on their hands." Hall testified that Mary had elevated levels of barium, lead, and antimony on her left palm; she also had increased levels of barium on the back of her right hand. Atina only had increased levels of barium on her left palm. Hall concluded that Mary either: (1) fired a gun; (2) handled a gun or cartridge case that had been recently fired; or (3) was in close proximity to a gun when it was fired. Hall acknowledged that the atomic absorption test is not as new or accurate as other techniques, such as the SEM method; however, Hall claimed that atomic absorption tests were still reliable and acceptable. The results indicated that Raymond had trace amounts of two of the elements but not all three.

6

Michael Jones, the funeral director, testified that Mary came to see him on April 1, 2011, the day after Raymond was murdered, requesting a direct cremation of the body, with no formal visitation or viewing of the body. Mary told Jones that she wanted it done as quickly as possible.

In the jury charge, the trial court included an instruction on the law of the parties. The jury found Mary guilty of murder and sentenced her to life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. This appeal followed.

## II. LEGAL SUFFICIENCY

By her sole issue, Mary argues that the evidence was legally insufficient to support her conviction for murder.

### A. Standard of Review and Applicable Law

In order to determine if the evidence is legally sufficient in a criminal case, the appellate court reviews all of the evidence in the light most favorable to the verdict and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018); *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) ("Due process requires that the State prove, beyond a reasonable doubt, every element of the crime charged."); *Brooks v. State*, 323 S.W.3d 893, 905 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)). This standard tasks the factfinder with resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts. *See Ingerson*, 559 S.W.3d at 509. On appeal, reviewing courts "determine whether the necessary inferences are reasonable based upon on the combined and cumulative force of all the evidence when viewed in the light

most favorable to the verdict." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Appellate courts must avoid "divide and conquer" strategies in reviewing the sufficiency of the evidence; instead, appellate courts must consider the evidence cumulatively. *See Nisbett*, 552 S.W.3d at 262.

We give great deference to the trier of fact and assume the factfinder resolved all conflicts in the evidence in favor of the verdict. *See Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). "An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence. A court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Nisbett*, 552 S.W.3d at 262. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Nisbett*, 552 S.W.3d at 262; *Orr v. State*, 306 S.W.3d 380, 395 (Tex. App.—Fort Worth 2010, no pet.). We will uphold the verdict unless the factfinder "must have had reasonable doubt as to any essential element." *Laster*, 275 S.W.3d at 517.

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge in this case would state that a person commits the offense of murder if he intentionally or knowingly causes the death of an individual by shooting the individual with a firearm. *See* TEX. PENAL CODE ANN. § 19.02(b)(1). Under the law of parties, the State does not have to prove that a person physically committed the crime, but the evidence must be sufficient to show that even though the criminal

conduct was performed by another, the defendant was still criminally responsible for that other person's behavior. *See id.* § 7.01(b)(c) (West, Westlaw through 2017 1st C.S.). To be criminally responsible for another person's conduct, a person must have acted with the "intent to promote or assist the commission" of the offense by soliciting, encouraging, directing, aiding, or attempting to aid the other person to commit the offense. *Id.* § 7.02(a)(2) (West, Westlaw through 2017 1st C.S.). Thus, the hypothetically correct jury charge in this case would also state that a person commits murder if the person acted with intent to promote or assist in the murder of a person by soliciting, encouraging, directing, aiding, or attempting to aid another person commit murder. *See id.*

## B. Analysis

We first note that Mary does not complain about the trial court's instruction to the jury to consider the law of the parties. Under the law of the parties, the State did not need to prove that Mary herself fired the gun that murdered Raymond. *See id.* § 7.01(b)(c). Also, as noted by the Texas Court of Criminal Appeals, when the identity of a murderer is at issue in a case, identity may be proven by all reasonable inferences derived from both direct and circumstantial evidence in the case. *See Ingerson*, 559 S.W.3d at 509 (citing *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009) ("[T]he State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence.")). After reviewing the record cumulatively in the light most favorable to the verdict, we conclude there was sufficient evidence to sustain Mary's conviction. *See Ingerson*, 559 S.W.3d at 509; *Nisbett*, 552 S.W.3d at 262.

The State had the burden of proving beyond a reasonable doubt that Mary intentionally or knowingly caused Raymond's death by shooting him with a gun. *See id*. § 19.02(b)(1). Or alternatively, the State needed to prove that Mary acted with intent to prove or assist in the murder of Raymond by soliciting, encouraging, directing, aiding, or attempting to aid another person in Raymond's murder. *See id.* § 7.01(b)(c). Mary concedes she had a strong motive to kill Raymond. Mary argues that the evidence was insufficient to prove the actus reus. In other words, it is undisputed that Raymond was shot and killed with a firearm and it is further undisputed that Mary wanted to kill Raymond, but Mary argues that there is insufficient evidence to prove the identity of the killer and that the evidence here does not prove that she "was the person that fired a high-powered rifle that killed Raymond Jacoby."

Mary explained that she was not at the gate when Raymond was shot; according to her, Raymond had already been shot when she arrived. However, the jury, being able to assess the credibility and demeanor of the witnesses at trial, did not have to believe Mary's version of events. *See Clayton*, 235 S.W.3d at 779. The jury was free to take notice of the inconsistencies in Mary's testimony. For example, Mary testified that she woke up at 6:20 a.m. on the day Raymond was murdered. However, cell phone records reflect that she received two calls from Killy: one at 6:01 a.m. and another at 6:12 a.m. She further claimed that Killy was in Dallas when she received those two calls. But cell phone records indicate that the calls from Killy originated in Mexia, Texas. Mary asserted that she called 911 twice, but the phone records only indicate a single call to 911. Lastly, Mary testified specifically that she latched the front gate before calling 911. However, when the officers arrived at the scene, they observed that the front gate was ajar.

10

The jury was also free to take notice of several oddities in Mary's retelling of the events of March 31, 2011. For instance, even though Mary routinely started the workday by arriving at 7:50 a.m., on the day Raymond was murdered, Mary arrived an hour early for unexplained reasons. Additionally, even though Atina testified that Mary was at the front gate by 6:50 a.m., Mary asserted she arrived at the gate several minutes after 7:00 a.m. According to Mary, she called 911 to report that somebody shot Raymond when she noticed Raymond face down on the ground. However, neither the paramedic or the officers could identify a bullet wound or otherwise tell that Raymond had been shot until he was flipped over. The jury could reasonably infer that Mary was the shooter or knew who the shooter was from evidence that she knew that Raymond had been shot before anyone else was able to identify bullet wounds. Mary, who lived less than a minute away from the gate where Raymond was murdered, apparently did not hear the gunshot at 7:00 a.m., and yet Spivey, a woman who also lives about a block away, testified that there was an extremely loud "boom" right at 7:00 a.m. The jury could have reasonably inferred that Mary was lying because she should have also been able to hear the gunshot based on how close she was. Also, even though Mary reported that somebody shot Raymond in her initial call to 911, when paramedics arrived and asked Mary what happened, Mary responded that she did not know what happened and that she had merely found Raymond face down. The jury was entitled to believe Atina and find that Mary had the opportunity to murder Raymond because she was at the front gate when multiple people heard the "boom" of a gunshot. Even though opportunity is not an element of murder, it is a circumstance indicative of guilt. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013).

Mary further argues that she was never found to be in possession of a high-powered rifle and that no identifiable ammunition was found at the scene of the crime. However, a defendant may be convicted for murder even when the murder weapon is never recovered. *See Ingerson*, 559 S.W.3d at 509. And while no specific murder weapon was identified or recovered, the police did recover a number of pistols that Mary had access to; the officers also identified some type of rifle in the scrapyard residence. Salzberger testified that based on the wounds, Raymond was likely shot with a rifle.

The atomic absorption test indicated that there was an elevated level of antimony, barium, and lead on Mary's hand. According to expert testimony, this likely indicated that Mary (1) fired a gun; (2) handled a gun or cartridge case that had been recently fired; or (3) was in close proximity to a gun when it was fired. Mary contends that the atomic absorption test is not as reliable as the SEM method, but the State's expert averred that atomic absorption tests are still reliable. Mary further argues that the presence of antimony, barium, and lead on her hand does not prove she was the shooter because it is possible to accumulate those elements by environmental means, such as handling car batteries. Mary argued that it was possible that the atomic absorption test gave a false positive because she works at a scrapyard and didn't wash her hands before the gunshot residue kit was administered to her. However, it was the jury's province to weigh the evidence, and the jury was free to disbelieve Mary's theory of why her hand had elevated levels of antimony, lead, and barium. *See Murray,* 457 S.W.3d at 448; *see also Temple*, 390 S.W.3d at 363 ("[I]t is not the State's burden to exclude every conceivable alternative to a defendant's guilt."). For instance, the jury could have reasonably inferred that if the elevated levels of antimony, lead, and barium on Mary's hand came from environmental

12

sources, then both of Mary's hands should have been covered in all three elements. *See Clayton*, 235 S.W.3d at 778. And if the elevated levels of antimony, lead, and barium on Mary's hand came from environmental sources, the jury might additionally infer that other people who work at the scrapyard, such as Atina and Raymond, should have increased levels of all three elements, as well. However, the State's experts testified that Mary was the only person who had elevated levels of all three of those elements; Raymond and Atina had one or two of the elements present, but neither of them had elevated levels of all three. Also, only one of Mary's hands had elevated levels of all three elements; the other hand just had increased amounts of barium.

Also before the jury was the testimony of Jones, the funeral director. He testified that Mary approached him the day after Raymond's murder and requested that Raymond be cremated as quickly as possible, without any formal visitations or viewings of the body. The jury could reasonably infer from this that Mary was attempting to dispose of the body discretely and quickly to conceal any potential evidence. *See Murray,* 457 S.W.3d at 448.

In addition to all of the above, Mary concedes that the jury heard undisputed and overwhelming evidence of her murderous animosity towards Raymond. The record indicates that on at least two different occasions, to different individuals, Mary offered a monetary incentive to murder Raymond. One of the individuals Mary sought for the job was Robin, a scrapyard employee. Once he rejected the offer, Mary merely exclaimed that if he refused to do it, somebody else would. The jury could reasonably infer that Mary sought someone else to murder Raymond. Furthermore, the jury heard evidence that Mary informed multiple people on multiple occasions of her desire for Raymond to die.

13

Just like opportunity, even though motive is not an element of murder, "it is a circumstance indicative of guilt." *Ingerson*, 559 S.W.3d at 510.

When all of the evidence is viewed in the light most favorable to the verdict, and we consider the cumulative force of all the admitted evidence and reasonable inferences that can be drawn therefrom, we conclude that the evidence was sufficient to support the verdict. *See id*. at 511; *Nisbett*, 552 S.W.3d at 262. We overrule Mary's sole issue.

### III. CONCLUSION

We affirm the trial court's judgment.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
18th day of April, 2019.