

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-24-00189-CR
_____

CATRINA RENEE GUY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 4
Tarrant County, Texas
Trial Court No. 1592780

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

MEMORANDUM OPINION

A Tarrant County jury convicted Catrina Renee Guy of first-degree murder and sentenced her to thirty-nine years' imprisonment and a fine of $2,250.00.[1]  *See* TEX. PENAL CODE ANN. § 19.02 (Supp.).  Guy claims there is insufficient evidence to support her conviction because there is no evidence that she was the shooter.  Because we conclude there was sufficient evidence for the jury to conclude that Guy was the shooter, we affirm the trial court's judgment.

## I.      Standard of Review and Applicable Law

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence." *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018).  "We assess legal sufficiency by viewing the evidence in the light most favorable to the verdict and asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bittick v. State*, 707 S.W.3d 366, 368 (Tex. Crim. App. 2024) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  "We compare the trial evidence to 'the elements of the offense as defined by a hypothetically correct jury charge for the case.'" *Id.* at 369 (quoting *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018)).

"This familiar standard 'recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence.'" *Braughton*, 569 S.W.3d at 608 (quoting *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)).  "On review, this Court determines whether the necessary inferences made by the trier of

---

[1]This appeal was transferred to this Court from the Second Court of Appeals pursuant to a Texas Supreme Court docket equalization order.  *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.).  Accordingly, we apply the precedent of the Second Court of Appeals in deciding this case to the extent that it conflicts with our own.  *See* TEX. R. APP. P. 41.3.

2

fact are reasonable, based upon the cumulative force of all the evidence." *Id.* (quoting *Adames*, 353 S.W.3d at 860). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Id.* "As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder." *Id.* "A reviewing court is thus 'required to defer to the jury's credibility and weight determinations.'" *Id.* (quoting *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.)). "However, juries are not permitted to come to conclusions based on 'mere speculation or factually unsupported inferences or presumptions.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007)).

"In reviewing the sufficiency of the evidence, we should look at '"events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act."'" *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021) (quoting *Hooper*, 214 S.W.3d at 13). "Each fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020) (citing *Hooper*, 214 S.W.3d at 13). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015). Further, we "consider all of the admitted evidence,

regardless of whether it was properly admitted." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020).

A person commits murder if she "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1). "A person acts intentionally, or with intent, with respect to the nature of h[er] conduct or to a result of h[er] conduct when it is h[er] conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a). Here, the State's indictment alleged that Guy "DID THEN AND THERE INTENTIONALLY OR KNOWINGLY CAUSE THE DEATH OF AN INDIVIDUAL, WILLIAM PRYGON, BY SHOOTING HIM WITH A FIREARM" and "DID THEN AND THERE INTENTIONALLY, WITH THE INTENT TO CAUSE SERIOUS BODILY INJURY TO WILLIAM PRYGON, COMMIT AN ACT CLEARLY DANGEROUS TO HUMAN LIFE, NAMELY, SHOOTING HIM WITH A FIREARM, AND THEREBY CAUSED THE DEATH OF WILLIAM PRYGON." The jury charge added party-liability language to both of the murder paragraphs in the application section.

## II. The Evidence at Trial

On the morning of April 11, 2019, Prygon was shot outside his home on Jacksboro Highway in Tarrant County. Trial testimony established that Prygon was addicted to crack cocaine, Guy was his dealer, and Prygon owed Guy a drug debt.

Sam Taylor,[2] who was dating Prygon's daughter Chloe, testified that at the time of the shooting, he and his mother, Melissa; his brother, Daniel; Prygon's daughters, Peggy and Chloe; Guy's sister, April Guy; and April's girlfriend, Naniece (Neesy), all lived on Prygon's property and were present at the time of the shooting.[3] Taylor testified that Prygon, Melissa, Daniel, and Peggy lived in the house, while he, Chloe, April, and Neesy lived in a trailer on the property.

Taylor testified that, on the morning of the shooting, many of the property's residents were cleaning either outside or inside when April took a phone call, after which she anxiously reported that "her sister[, Guy,] was on the way" and that "she want[ed] Bill to give her the money." Taylor identified Guy as "the person that Bill got his drugs from." Fifteen minutes later, Guy arrived as the passenger in a white car. A "tall black guy" was the driver. At that point, Taylor, Chloe, Prygon, April, and Neesy were outside, while Taylor's mom, brother, and Peggy were inside the house.

Taylor said that both Guy and the driver got out of the car and that the driver retrieved a gun from the backseat and was loading it while Guy went to talk to Prygon. Guy appeared angry, and she asked Prygon, "Where is my f***ing money?" Prygon began backing away, with his phone in his hand, and said, "I'm not going to pay you." The verbal exchange continued, and Guy responded, "I'm going to kill you."

Prygon and Guy continued to argue, and Guy retrieved a semiautomatic handgun from the driver of the car, who was on the driver's side of the car. Guy again approached Prygon.

---

[2]Taylor testified that he was fifteen at the time of the incident, and several other witnesses did not give their ages. In order to protect the privacy of persons who were, or possibly were, minors at the time of the incident, we use pseudonyms for some witnesses. *See* TEX. R. APP. P. 9.10.

[3]Because April and Chloe share surnames with other involved persons, we use their given names.

5

Guy pulled the trigger, but the gun misfired. Prygon took off running as Guy successfully reloaded the gun. Guy ran after him, with her arm outstretched and the gun in her hand.

Prygon ran to the back of a shipping container at the back of the property. At that point, Taylor and Chloe went to the back of their trailer, and April and Neesy got in their vehicle and drove off. Taylor said although he could not see, he heard a gunshot, followed by Prygon screaming, "You f***ing shot me." Taylor heard six or seven more gunshots after that, with no more yelling from either Guy or Prygon. Taylor then saw Guy run from the front of the shipping container back to the white car, and the driver and Guy took off.

Taylor testified that he then ran to Prygon, who had "several gunshot wounds." Melissa, Daniel, Peggy, and Chloe all came outside near the area where Prygon was, and someone called 9-1-1. Taylor agreed that there was never a doubt in his mind that Guy was the shooter.

Chloe testified that Prygon had a substance-abuse problem and that one of his dealers was Guy. Shortly before Prygon's murder, April told Chloe that there was a disagreement between Prygon and Guy. Chloe said that April was worried or upset and possibly tried to warn her that something was going to happen.

Chloe saw Guy and the driver arrive in the white car. Chloe testified that Guy got out with her firearm, Guy approached Prygon, and they argued. Guy said she was "going to fight" Prygon, and she handed her gun to the driver, who was standing between the car door and the car. Chloe testified that Prygon appeared ready to fight Guy, and Guy "seemed nervous, so she reached back and got her gun" from the driver. Guy cocked the gun and pointed it at Prygon's chest, but nothing happened, and then Prygon took off running toward the back of the shipping

6

container, with Guy following, shooting at Prygon. Chloe said that, when she and Taylor lost sight of them, as Guy rounded the edge of the shipping container, they closed and locked the door to their trailer and ran to the back, where she could still see outside. Chloe said they heard several shots while Prygon was on the other side of the shipping container, and she heard Prygon say, "You shot me." Chloe said Prygon then made it to the corner of the shipping container, and when she saw him, she could tell he had been shot. She saw him fall on his side and roll to his back. Chloe testified that they heard Guy's car leave, but she was not sure when April and Neesy left. Chloe testified Prygon and Guy had a previous confrontation where Guy "threatened him with a firearm," but "nothing came of it."

April testified that Prygon owed Guy money for drugs and April let Prygon know that he needed to pay Guy. April said Guy told Prygon she was going to "whup his a**," but she never heard either of them tell the other they were going to kill them. April said that, on the morning Prygon was killed, Guy called her and told her she was on the way, and she needed her money. April testified that Prygon woke her up that morning and told her that "he had been getting into it with [her] sister all morning" and that Guy was coming over. April said she did not have to tell Taylor and Chloe about Guy's phone call to her because "everybody heard it" when Prygon told her that Guy was coming over. April said her girlfriend tried to get her to leave at that point, and as they were leaving, Guy arrived with the driver, whom April called "Alley Cat."

April said Alley Cat got out of the car, and he had a gun. April recounted the argument between Guy and Prygon, but April said Prygon hit Guy, who did not have a gun, in the face and then "act[ed] like he was going to grab something from his back pocket." Continuing with a

7

different version of events, April said Guy then asked Alley Cat for help, saying, "Beat his a\*\*, beat his a\*\*," and Guy got inside the car. Again, inconsistent with Taylor and Chloe, April testified that Alley Cat, not Guy, ran after Prygon. April did not hear Prygon say anything to Alley Cat. April said Alley Cat then chased Prygon behind a shed and "[s]tarted to shoot," but April did not actually see Alley Cat shoot Prygon. April said she left when she heard the shots.

On cross-examination, April agreed that she was not arguing about whether Prygon was murdered—she just claimed it was not Guy who did it. April said she never called 9-1-1 and never talked to the police. She called Alley Cat a friend of her family and said members of her family could identify him, but she never reported that to the police. Although the State attempted to talk with her about the case, April would not communicate with them, and she did not want to cooperate. April also admitted that she had been convicted of felonies and thefts before—but she did not know how many of either—as well as possession of a controlled substance and credit card or debit card abuse. April further testified that she dealt drugs to Prygon before Guy did.

William Wedel, an officer with the Fort Worth Marshal's Division, testified that he was dispatched to Prygon's address on the morning of the shooting. When he arrived, he met four or five people in the backyard near a shipping container where Prygon's body was located. The group informed Wedel that the lone shooter was a female who got out of a white car with a gun, shot Prygon, and left in the white car being driven by a large black male. Wedel testified that Prygon had been shot multiple times from the front and was clearly deceased.

8

Officer Juan Aguilar with the Fort Worth Police Department testified that he was also dispatched to Prygon's address after the shooting. Aguilar testified that Prygon's body was found at the far end of a shipping container located at the rear of Prygon's property. Aguilar testified that he spoke to a neighbor behind the fence where the shooting occurred, and the neighbor, who also made the first 9-1-1 call, said that, through the fence, she saw a female shoot Prygon multiple times.

### III. Legally Sufficient Evidence Supports the Jury's Findings of Guilt

In her sole point of error, Guy claims the evidence was insufficient to support her conviction. Guy asserts there was insufficient evidence that she was the shooter. We disagree.

The State had the burden of proving beyond a reasonable doubt that Guy "intentionally or knowingly" caused Prygon's death or that she "intend[ed] to cause serious bodily injury and commit[ed] an act clearly dangerous to human life" that caused Prygon's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1)–(2). The only issue in dispute here is the identity of the murderer. "Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence." *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018). Applying the appropriate standard of review, we conclude that the evidence here was sufficient to sustain Guy's conviction.

The evidence establishes that Guy had communicated her displeasure to Prygon about his outstanding drug debt and that she intended to collect it from him on the morning of his death. Multiple witnesses testified that Guy confronted Prygon on his property, but there were differing accounts of who did the shooting after Guy initially demanded payment. Chloe and her

9

boyfriend, Taylor, both testified that Guy chased Prygon behind the shipping container, shot him, then fled with the driver in the white car. April, on the other hand, testified that Guy got back in the car after her initial confrontation with Prygon and the driver, a male whom she called Alley Cat, shot Prygon before they fled. Officer Aguilar testified that a neighbor saw a female shoot Prygon.

Guy does not contest the reasonable inference from the testimony that Prygon's shooting was the cause of his death. And although there was no testifying eyewitness to the shooting, "[d]irect evidence and circumstantial evidence are equally probative" to prove the shooter's identity, *see Ramsey*, 473 S.W.3d at 809, and "[e]ach fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction," *Walker*, 594 S.W.3d at 335.

The cumulative force of all the incriminating circumstances here was sufficient to support Guy's conviction. As the "sole judge of the weight and credibility of the evidence[,]" the jury was free to accept Taylor's and Chloe's testimony that it was Guy who ran behind the shipping container with the gun and shot Prygon and to reject April's testimony that it was Alley Cat who ran after and shot Prygon instead.[4] *See Braughton*, 569 S.W.3d at 608. Deferring to the jury's weight and credibility determinations and viewing the evidence in the light most favorable to the verdict, we conclude that legally sufficient evidence supports the jury's finding that Guy intentionally or knowingly caused Prygon's death.

---

[4]Independently, the jury could have determined Guy's guilt based on her shared criminal responsibility with the driver. If the jury believed the driver did the shooting, they could have credited April's testimony that Guy encouraged the driver to commit the offense as a basis for finding Guy criminally responsible for the driver's actions under the instructions they were given regarding the law of parties. *See* TEX. PENAL CODE ANN. § 7.01, § 7.02 (Supp.).

We overrule Guy's sole point of error.

## IV. Conclusion

We affirm the judgment of the trial court.

Jeff Rambin
Justice

Date Submitted:    June 4, 2025
Date Decided:      July 14, 2025

Do Not Publish