**AFFIRMED as MODIFIED and Opinion Filed November 15, 2023**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-22-01144-CR

### JONATHAN DEON MIDDLETON, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 1**
**Dallas County, Texas**
**Trial Court Cause No. F20-76983-H**

## MEMORANDUM OPINION

Before Justices Carlyle, Smith, and Kennedy
Opinion by Justice Smith

Appellant Jonathan Deon Middleton appeals his conviction for murder. *See* TEX. PENAL CODE §19.02(b). The trial court assessed appellant's punishment at fifty years confinement in the Institutional Division of the Texas Department of Criminal Justice. In one issue, appellant argues the evidence was insufficient to prove the element of identity. Because we conclude that the State presented legally sufficient evidence to show beyond a reasonable doubt that appellant shot and killed the victim, we affirm the judgment of conviction as modified herein.

## Background

The State charged appellant with murder under two alternative manner and means: (1) intentionally and knowingly causing the death of Cozie Mathis by shooting him with a firearm, a deadly weapon, *see id.* § 19.02(b)(1); and (2) with the intent to cause serious bodily injury to Mathis, committed an act clearly dangerous to human life—shooting Mathis with a firearm, a deadly weapon—and thereby caused the death of Mathis. *See id.* § 19.02(b)(2). Appellant waived his right to a jury, and the case proceeded to a bench trial.[1]

At trial, the evidence showed that Mathis was shot in the forehead and dumped on a residential street. A man saw him lying on the street, "wiggling, still alive," around 3 a.m. on October 30, 2020; he called 9-1-1. When paramedics arrived, Mathis was alive but unconscious. He was transported to the hospital, but hospital personnel were unable to save him. A medical examiner, who reviewed the autopsy report but did not himself perform the autopsy, testified that the bullet entered on the left side of Mathis' forehead and stopped above his left jawline, inside the cheek area. The medical examiner further testified that the cause of Mathis' death was a gunshot wound to the head, and the manner was homicide.

At first, police had no leads. No one interviewed in the neighborhood where Mathis' body was found had heard gunshots or seen anything and, although

---

[1] The trial court also heard the State's motion to revoke probation in a prior aggravated robbery case, which is not before us on appeal.

surveillance footage from one of the homes showed a person stopping a vehicle, getting out of the driver-side door, walking around the back of the vehicle, taking something out of the passenger-side door, putting it on the ground, and then driving away, the video was of such quality that police could not identify the type of car or ascertain a description of the person seen on the video. The police solicited tips from the community through a Crime Stoppers Bulletin.

After seeing the Crime Stoppers Bulletin on social media, as well as other posts about the victim, Thomas Andrews called police. He realized he knew the victim and had information about his death. Andrews testified that appellant came to his apartment one day after work to hang out with him and their mutual friend Jamari Swann.[2] Appellant told them that he and Mathis robbed someone, argued over the proceeds, and then appellant shot Mathis in the head. Appellant further told them that he took Mathis out of the car and left him in the street. When Andrews did not believe appellant, appellant took them out to his car and showed them the blood on the passenger seat. Appellant was driving a black Audi. Andrews showed police a picture of appellant and the Audi on social media. Andrews also testified he was currently on felony probation and did not want to be involved but was subpoenaed. He was fearful of appellant and the people appellant knew.

---

[2] Andrews did not tell police that Swann was also there; he wanted to keep him out of it.

–3–

Jamari Swann, who went to school with appellant for several years, testified similarly. Swann explained that appellant called him to hang out, but Swann and Andrews were about to leave to go to Andrews' house. After appellant arrived at Swann's, he followed them to Andrews'. He was in an Audi. While at Andrews' house, appellant told him that he and Mathis had been out "hitting licks," which meant robbing people, stealing things. Mathis had something appellant wanted, so appellant traded him the Audi for it. Appellant's friends belittled him for making the trade and told him to go "handle it," so appellant did. Appellant and Mathis were driving around when Mathis nodded off, and appellant shot him. Swann testified the car appellant was in had blood on the passenger seat; he could see it because the convertible top was off. Swann further testified that he did not initially report what appellant said to police because he did not want to be involved. However, he decided to do the right thing because he did not want the victim's family left wondering what happened. He did not come forward until about a week before trial. Swann admitted that they were smoking marijuana at Andrews' when appellant told them what he had done.

Based on the information Andrews reported to police, coupled with information from the Mathis' family that linked Mathis to a black Audi and a possible conflict over the car, police searched their database for black Audi A5s. Detective Derick Chaney of the Dallas Police Department (DPD), who was in the Homicide Unit at the time, testified that he found a few Audis listed in the database,

and one had a surveillance video associated with it because it had been stolen. Detective Chaney explained that the video showed appellant walking around a parking garage, like he was checking the door handles of cars. Appellant could not be seen getting in the Audi on the video; however, the video showed the Audi being driven away, stopping, and then showed appellant getting out of the Audi, back in, and driving off again. Through the database, Detective Chaney identified the owner, found the car, and requested it towed to the Dallas City Pound for processing.

Appellant's fingerprints were found in the Audi, specifically on the driver's side, the front window of the passenger side, and on several items recovered from the vehicle. Julia Wayland, a Crime Scene Analyst with DPD, testified that blood was visible on the inside of the passenger door. When she applied Bluestar, which is a presumptive test for blood, sections of the passenger door, seat, running board, and floor luminesced. She collected items from the car for further testing, including cigarettes, some of the seat cushions and plastic, seat covers, and carpet.

Amanda Webb, a DNA analyst in the Biology Unit at Southwestern Institute of Forensic Sciences testified that the DNA deposited on the cigarette butts and the interior driver pull "matched" the DNA profile of appellant, with a statistical weight of less than one in ten trillion, which is the highest statistic the laboratory reports out. The DNA collected from the swabs of the interior passenger door, front passenger seat back, and carpet matched the DNA profile of Mathis, also with a reported statistical weight of less than one in ten trillion.

Appellant testified in his own defense and denied shooting Mathis. He admitted that he stole the black Audi from the parking garage in mid-October, but he kept it for only three or four days, until approximately October 20 or 21, 2020, and then gave it to his friend. On cross-examination, the State asked appellant about messages he posted on social media, one of which he posted on November 1: "I got my Audi back. I'm getting paper tags." Appellant admitted that he got the Audi back but continued to deny he had it on October 30, the day Mathis was murdered. In an Instagram message to Swann on October 27, appellant said, "Take me to the pawn shop asap. I need a gun." Appellant testified in response to being shown this message that he was "always looking for a gun . . . [s]o it's not just three days before the murder."

Appellant also explained that, although he knew of Andrews because he saw him around the Pleasant Grove area, he was not friends with him. He was friends with Swann and did tell him that the car that he had "got a body on it," meaning someone died in it, but he never told Swann he shot someone in it. Appellant believed Swann misheard him and told Andrews; he never talked to Andrews about the car. He also heard who died in the car, and he knew him, but they were not friends.

In addition to appellant's testimony denying he was the person who shot Mathis, the defense presented testimony regarding other suspects, questioned the credibility of Andrews and Swann, established that the DNA and fingerprint

evidence did not prove when appellant was in the car, questioned the amount of blood found in the car, questioned whether Mathis was shot at close range, and questioned the police about not investigating other suspects, not following leads, and not testing certain evidence. Specifically, as to alternate suspects, Laquitha Wilson, Mathis' mother, testified that she reported to police that people had told her that Mathis had an issue with a man named "Yank" and that Yank was the last person seen with Mathis. Mathis' brother, Datorian Mathis, also testified that he believed Yank had something to do with his brother's death. Datorian further testified that someone took his brother's phone and changed his Instagram feed; he believed it was Mathis' killer. The person deleted pictures, blocked people, and changed the name on the account. Datorian never saw posts of Mathis and appellant together on Instagram.

After hearing all the evidence, the trial court found appellant guilty of murder and assessed his punishment at fifty years' confinement. This appeal followed.

## Sufficiency of the Evidence to Prove Identity

Appellant argues in his sole issue on appeal that the evidence was legally insufficient to prove the element of identity. In every criminal case, the State must prove beyond a reasonable doubt that the defendant is the person who committed the offense charged. *Miller v. State*, 667 S.W.2d 773, 775 (Tex. Crim. App. 1984); *Nelson v. State*, No. 05-21-00945-CR, 2023 WL 6425689, at *3 (Tex. App.—Dallas Oct. 3, 2023, no pet. h.) (mem. op., not designated for publication).

In reviewing the legal sufficiency of the evidence, we consider whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We review the evidence in the light most favorable to the verdict and defer to the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Jackson*, 443 U.S. at 319; *see also Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012); *Isassi*, 330 S.W.3d at 638. A criminal conviction may be supported by both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This is true even for the element of identity. *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018).

Here, Andrews and Swann testified that appellant told them he and Mathis were riding around in the Audi and, after Mathis fell asleep, he shot him in the head. He then dumped his body and left him on the street. Andrews and Swann also testified that they saw blood on the passenger seat of the Audi. Forensic evidence linked the Audi to appellant and to Mathis, and the blood evidence found in the passenger side of the Audi supported Andrews' and Swann's testimony.

Despite this evidence, appellant argues that his testimony was sufficient to weaken the State's evidence on identity so that no rational trier of fact could have found him guilty of Mathis' murder beyond a reasonable doubt. Appellant also

–8–

emphasizes that there were no eyewitnesses to the crime. But the law does not require an eyewitness to prove identity. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009). Additionally, although appellant testified and denied shooting Mathis or having the Audi when Mathis was shot, the trial court, as the trier of fact in a bench trial, is the sole judge of the credibility of the witnesses and the weight of their testimony. *Adelman v. State*, 828 S.W.2d 418, 421–23 (Tex. Crim. App. 1992); *Goodwin v. State*, 376 S.W.3d 259, 264 (Tex. App.—Austin 2012, pet. ref'd). The trier of fact may choose to believe or disbelieve any part of any witness's testimony. *Adelman*, 828 S.W.2d at 421.

Having reviewed the evidence in the light most favorable to the trial court's finding, we conclude that any rational trier of fact could have found beyond a reasonable doubt that appellant was the person who shot and killed Mathis. We overrule appellant's sole issue on appeal.

### Modification of Judgment

Although not raised by either party, we must also address errors in the judgment discovered upon our review. It is incumbent on the trial court and the district clerk's office to issue judgments that properly reflect what occurred in any given case. *See* TEX. CODE CRIM. PROC. art. 42.01 (setting out required provisions of a criminal judgment). This Court has the power to modify a judgment to speak the truth when we have the necessary information to do so. *See* TEX. R. APP. P.

43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd) (en banc).

Here, under the section of the judgment titled, "Terms of Plea Bargain," there is an X in a box followed by "Terms of Plea Bargain are attached and incorporated herein by this reference."  However, the record shows that appellant pleaded not guilty to the murder charge and the case proceeded to a bench trial; therefore, there were no plea bargain terms relevant to this case.  As such the judgment should be modified.

## Conclusion

Under the section of the judgment titled, "Terms of Plea Bargain," the X in the box followed by "Terms of Plea Bargain are attached and incorporated herein by this reference" is deleted, and the section is modified to read "N/A."  As modified, we affirm the judgment of conviction.  The trial court is directed to prepare a corrected judgment that reflects the modification made in this Court's opinion and judgment. *See Shumate v. State*, 649 S.W.3d 240, 245–46 (Tex. App.—Dallas 2021, no pet.).

/Craig Smith/
CRAIG SMITH
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
221144F.U05

–10–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

JONATHAN DEON MIDDLETON, Appellant

No. 05-22-01144-CR    V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 1, Dallas County, Texas Trial Court Cause No. F20-76983-H. Opinion delivered by Justice Smith. Justices Carlyle and Kennedy participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

Under the section of the judgment titled, "Terms of Plea Bargain," the X in the box followed by "Terms of Plea Bargain are attached and incorporated herein by this reference" is deleted, and the section is modified to read "N/A."

As **REFORMED**, the judgment is **AFFIRMED**.

We **DIRECT** the trial court to prepare a corrected judgment that reflects this modification.

Judgment entered this 15th day of November 2023.