**Affirm and Opinion Filed October 28, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-23-00383-CR**

**CRAIG EVERETT LYLES, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 199th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 199-83595-2020**

## MEMORANDUM OPINION

Before Justices Molberg, Nowell, and Kennedy
Opinion by Justice Molberg

A jury found appellant Craig Everett Lyles guilty of aggravated assault with a deadly weapon (a firearm) and assessed punishment at seven years' confinement. Lyles appeals, arguing (1) the trial court erred in admitting certain non-expert testimony regarding bullet trajectory, (2) there is legally insufficient evidence to support his conviction, and (3) the trial court erred in denying his motion for directed verdict. We affirm the trial court's judgment in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

BACKGROUND

Lyles was charged by indictment in November 2020. The indictment states that, on or about April 6, 2020, Lyles "[d]id then and there intentionally and knowingly threaten Samuel Head with imminent bodily injury and did then and there use or exhibit a deadly weapon, to-wit: a firearm, during the commission of said assault." Lyles pleaded not guilty. The case was tried to a jury in March 2023.

Generally, the case involves shots fired onto property where Samuel Head, the complainant named in the indictment, lived with his father Joe and other family members.[1] Six witnesses testified during the guilt/innocence phase, including Samuel, along with five others who were members of law enforcement or who had some connection to the investigation of the offense.

Around April 2, 2020, after noticing bullet holes on a recreational vehicle (RV) and a truck on the property, Samuel called the police, photographed the damage, and set up a trail camera. He noticed more bullet holes on the RV in the days that followed.

Samuel and his dad, Joe, worked together to try to find out where the shots were coming from, including by using a laser to try to get a trajectory. Samuel testified they "took a pointer lens through some of the existing bullet holes from the interior of the camper to see if we could kind of line up and . . . see where they're coming from" and "also used CB antenna through the holes from the outside to kind

---

[1] Because they share the same surname, for clarity, we will refer to Samuel and Joe by their first names.

of figure [it] out." Samuel testified the laser hit on the apartment building reflected in State's exhibit 6 and pointed between the third and fourth floors to the right of the brick section and to a direction higher than the third floor.

On April 6, 2020, Samuel and one of his friends inspected the latest damage to the RV. As they stood by the front passenger side, Samuel "hear[d] a break of wind and then air move under [his] neck . . . and a bullet str[uck] in front of the RV." Samuel testified "it was close" and "scared the hell out of" him and said the shot came from the direction of area apartments. He also testified that no one was walking or driving on that street at the time. When police responded, they investigated apartment 410 because Samuel had noticed that its balcony door was frequently open, but they ruled that out after discovering an older woman with no guns lived there.

Later on April 6, 2020, while Samuel was outside, he noticed a man he had never seen before walking by, and photos of the man were captured on the trail camera. The man ignored Samuel's greetings and seemed intent on looking at the damage to the RV. Also later that evening, another shot occurred, after dark.

Samuel saw the same man on the balcony of apartment 310 on April 7, 2020, one of the many days when shots were fired. At trial, Samuel identified Lyles as the man he had seen walking by his house on April 6, 2020, and sitting on the balcony on April 7, 2020. Beginning on April 7, 2020, Samuel began noticing a pattern that when shots were fired, the door of apartment 310 was open.

–3–

More shots occurred on April 8 and 9, 2020, and the same pattern continued.

On April 9, 2020, 911 was called, and Detective James Burson, who was not in uniform, arrived in an unmarked vehicle. As Detective Burson stood outside, off of the front porch as he talked with Samuel and his father, he heard a gunshot whiz by his ear. Detective Burson was advised of the pattern Samuel had noticed, and after the shot, Detective Burson then witnessed that pattern himself, testifying that he saw the open patio door of a specific apartment, a white male coming out onto the patio balcony, look around, go back inside, and close the door. Detective Burson called for backup and directed law enforcement to go to apartment 310.

Law enforcement personnel attempted to contact the resident inside apartment 310, but that person did not immediately come out. Law enforcement personnel then treated that person as a barricaded person, and crisis negotiators attempted to communicate with the person inside through various means, including by cell phone call and text and by loud hailing with a helicopter and drone. None of those methods worked. After several hours, police made contact with the person's father, and the person, identified at trial as Lyles, came out of apartment 310.

Police obtained a search warrant and entered apartment 310. Among other things, police found a large amount of firearms that included both handguns and rifles; a large amount of ammunition, including .22 long rifle ammunition and other loose ammunition around the apartment; a small folding-type table in the middle of

the living room floor; and some evidence of bullet strikes on a railing inside the apartment, as well as some bullet fragments on the balcony.

Stefani Campbell, a criminalist with the Carrollton Police Department, did a gunshot residue (GSR) collection on both of Lyles's hands. On cross-examination, she agreed it was a best-practice protocol to bag the hands of a potential suspect and testified Lyles's hands were not bagged before she did the GSR collection. She did not do a GSR collection on any guns, on Lyles's clothes, on a railing, or on the backseat of the patrol car where Lyles had been sitting before she conducted the GSR collection. David Spence, a trace evidence examiner for the Southwestern Institute of Forensic Sciences, conducted testing on the GSR collection taken from Lyles's hands. After doing so, Spence issued a report confirming the presence of five particles characteristic of primer GSR, with four particles on the sampling from Lyles's left hand, and one particle on the sampling from his right. Spence testified, and his report indicated, that the presence of these particles on Lyles's hands could be due to his firing a firearm, being in the proximity of a firearm when it was fired, or handling a firearm, a firearm component, or an object with primer GSR.

Campbell attempted to do a trajectory analysis but was unable to do so because she lacked the necessary equipment, as the bullet holes were smaller than the trajectory rods her department had at the time. The photographs she took were to establish a line-of-sight direction, not a trajectory to establish that a projectile came from apartment 310.

Lyles was arrested after the search of apartment 310.

At trial, after the State rested in the guilt/innocence phase, Lyles moved for directed verdict, arguing, in part, that the evidence was legally insufficient because there was "no evidence that anyone saw [Lyles] with a firearm, that he used the firearm or that he exhibited a firearm in this case . . . to threaten" Samuel.

The trial court denied the motion. Lyles called no witnesses during the guilt/innocence phase. The jury was charged, and after counsel made closing arguments, the jury deliberated and found Lyles guilty. After the sentencing phase, the jury assessed his punishment at seven years' confinement and no fine. The trial court pronounced his sentence, certified his right to appeal, and signed the judgment at issue. Lyles timely appealed.

## ISSUES & ANALYSIS

### A.    Sufficiency of the Evidence

We first consider Lyles' second and third issues because, if we find the evidence legally insufficient to support Lyles' conviction, we must reverse and render a judgment of acquittal.[2] Also, because his second and third issues involve the same review standards, we consider them together. *See Canales v. State,* 98 S.W.3d 690, 693 (Tex. Crim. App. 2003) (considering an appellant's argument that

---

[2] *See Burks v. United States*, 437 U.S. 1, 18 (1978) ("Since . . . the Double Jeopardy Clause precludes a second trial once a reviewing court has found evidence legally insufficient, the only 'just' remedy available for that court is the direction of a judgment of acquittal."); *Winfrey v. State*, 393 S.W.3d 763, 774 (Tex. Crim. App. 2013) (after concluding evidence was insufficient, court reversed judgment of the court of appeals, rendered judgment of acquittal, and cited *Burks* as requiring the remedy of appellate acquittal on grounds of evidentiary sufficiency).

the trial court erroneously overruled his motion for a directed verdict as a challenge to the legal sufficiency of the evidence to support the conviction); *Rice v. State*, 195 S.W.3d 876, 879 (Tex. App.—Dallas 2006, pet. ref'd) ("A challenge to the trial judge's ruling on a motion for an instructed verdict is in actuality a challenge to the sufficiency of the evidence to support the conviction.").

Under the Due Process Clause, a criminal conviction must be based on legally sufficient evidence. *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979)). When assessing the sufficiency of the evidence, an appellate court considers all of the evidence in the light most favorable to the verdict to determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *See Jackson*, 443 U.S. at 318–19; *Witcher v. State*, 638 S.W.3d 707, 709–10 (Tex. Crim. App. 2022). Further, an appellate court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight assigned to their testimony. *See Jackson*, 443 U.S. at 319, 326; *Witcher*, 638 S.W.3d at 710. An appellate court will consider all evidence when reviewing the sufficiency of the evidence, whether direct or circumstantial, properly or improperly admitted, or submitted by the prosecution or defense. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

In this case, by finding Lyles guilty of the charged offense, the jury found that, on or about April 6, 2020, Lyles "[d]id then and there intentionally and knowingly

–7–

threaten [Samuel] with imminent bodily injury and did then and there use or exhibit a deadly weapon, to-wit: a firearm, during the commission of said assault." *See* TEX. PENAL CODE §§ 22.01(a)(2), 22.02(a).[3]

On appeal, Lyles challenges the sufficiency of the evidence as to only one aspect of the offense: his identity as the perpetrator. He argues the State's evidence was insufficient to allow any rational trier of fact to find him guilty beyond a reasonable doubt and states, "Specifically, the evidence establishes that no person observed [Lyles] with a firearm at any time during the period when the shootings occurred." But "the law does not require an eyewitness to prove identity[,]" *see Middleton v. State*, No. 05-22-01144-CR, 2023 WL 7634396, at *3 (Tex. App.— Dallas Nov. 15, 2023, no pet.) (mem. op., not designated for publication), and "[i]dentity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence." *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018).[4]

Lyles also argues the State could have conducted a more thorough investigation. As one example, Lyles argues:

---

[3] A person commits aggravated assault if the person commits assault as defined in Texas Penal Code § 22.01 and either causes serious bodily injury to another, or uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE § 22.02(a). Among other things, a person commits assault under § 22.01 if the person "intentionally, knowingly, or recklessly threatens another with imminent bodily injury." *Id*. § 22.01(a)(2).

[4] *See also Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) ("Evidence as to the identity of the perpetrator of an offense can be proved by direct or circumstantial evidence."); *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009) ("The State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence.") (citing *Earls*, 707 S.W.2d at 82).

> [T]he State failed to collect evidence that could have included or excluded [Lyles] as the shooter. The State could have attempted to collect samples from the tray table or balcony railing—areas that they used to support their narrative that [Lyles] committed this offense— but, they failed to do the minimum amount of work to provide conclusive evidence in this case.

Lyles does not explain how the alleged inadequacy of the State's investigation impacts our sufficiency review but seems to suggest that the State did not present sufficient evidence simply because the State could have sought and presented more evidence than it did.  To the extent he makes that argument, we reject it.  *See David v. State*, 663 S.W.3d 673, 681 (Tex. Crim. App. 2022).[5]

Viewing the evidence, as we must, in the light most favorable to the verdict, we conclude any rational trier of fact could have found beyond a reasonable doubt that Lyles committed the charged offense based upon the circumstantial evidence and reasonable inferences from it.  *See Jackson*, 443 U.S. at 318–19; *Witcher*, 638 S.W.3d at 709–10 (both describing review standards); *see also Ingerson*, 559 S.W.3d at 509 ("Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence.").

We overrule Lyles's second and third issues.

---

[5] *David* involved an appeal of a conviction for felony tampering with physical evidence.  663 S.W.3d at 675, 681 (referring to David's act of tampering as "dumping loose marijuana into a toilet bowl filled with water and human waste").  In that case, when challenging the State's evidence, the appellant argued about steps that law enforcement could have taken to further investigate, such as collecting and testing the marijuana.  *Id*. at 681.  In addressing that argument, the court stated, "Just because the agents *could* have collected the marijuana, dried it, and tested it, does not mean that the agents *had* to collect the marijuana, nor does it mean that the evidence is somehow 'less sufficient' because they did not."  *Id*.  Similar reasoning applies here.  Just because the State could have done more to investigate the offense does not mean that the State failed to present enough evidence.

## B.    Non-Expert Testimony

In his first issue, Lyles argues the trial court abused its discretion in admitting certain non-expert testimony regarding bullet trajectory, specifically, testimony by Samuel regarding certain actions he and his father took to try to determine where the shots to their property were coming from.  The State argues no error occurred, and even if it did, it was harmless.

At trial, Samuel testified on two different days.  During the first day of his testimony, the following exchange occurred during his direct examination, without any objection by Lyles:

> [PROSECUTOR]:  And all of these days leading up to April 6th, had you and your dad, Joe, had you been kind of working together collaborating to try to find out where these shots were coming from?
>
> [SAMUEL]:  Yes, we were.
>
> [PROSECUTOR]:  Did you at one point even use your own laser to try to get a trajectory?
>
> [SAMUEL]:  Yes, we did.
>
> [PROSECUTOR]:  Did you actually think at one point – um, or were you able to kind of narrow down an area?
>
> [SAMUEL]:  Yes, we did.  Um, so we took a pointer lens through some of the existing bullet holes from the interior of the camper to see if we could kind of line up and you see where they're coming from. We also used CB antenna through the holes from the outside to kind of figure out.

On the next day of his testimony, and during his continued direct examination, the State questioned Samuel about this again in this exchange, this time prompting Lyles to object:

[PROSECUTOR]: This is State's Exhibit 6. Now, yesterday you talked about . . . April 6th of 2020, . . . that same day that you were shot at and felt that bullet under your neck. Did you and your father actually try to do some trajectory?

[SAMUEL]: Yes, we did.

[PROSECUTOR]: And what were the different ways you tried to do that?

[DEFENSE COUNSEL]: And, Your Honor, I'm going to object as to any testimony in regards to trajectory from a lay witness. That requires more specialized and expert training. It's just –

THE COURT: Response?

[PROSECUTOR]: Your Honor, this witness, I believe he can talk about his experience. They just ran a laser through the holes and can testify about their experience and what they observed.

THE COURT: I'll let you lay groundwork first, before I admit it.

[PROSECUTOR]: Sam, what did you and your dad do?

[SAMUEL]: So from my – from inside the RV, we ran a laser through the damage to see where the laser would hit.

[DEFENSE COUNSEL]: Your Honor, again, I'm going to object as to any testimony in regards to the determining a laser trajectory from a lay witness. It requires specialized training. They're not trained. There's no foundation that's been laid from what the conclusion that they're seeking.

THE COURT: Overruled.

[PROSECUTOR]: Sam, could you describe that again?

[SAMUEL]: So, um, green-colored laser, we shined it through the bullet holes from inside of the trailer and see where it would hit the building or just kind of get a general direction where they came from.

[PROSECUTOR]: So did you go – to make sure I understand you correctly, you went inside your RV, your camper, correct?

[SAMUEL]:  Correct.

[PROSECUTOR]:  And you found a hole, a bullet hole, and you took a green laser and put that directly through a bullet hole?

[SAMUEL]:  Correct.

[PROSECUTOR]:  To shine the laser in the direction of that hole?

[SAMUEL]:  Yes.

[PROSECUTOR]:  And is there a certain location where it, um, ended up?

[SAMUEL]:  Between the third and fourth floors to the right of the brick section.

[PROSECUTOR]:  So, did it hit on this apartment building that we have here in State's Exhibit 6?

[SAMUEL]:  Yes, it did.

Later, during cross-examination, Samuel admitted he has no specialized training regarding trajectory.[6]

---

[6] Samuel testified:

[DEFENSE COUNSEL]: Okay. Now, you did your trajectory, your laser thing, right?

[SAMUEL]:  Yes.

[DEFENSE COUNSEL]: And it was – it was pointed in a direction that was actually higher up than the third floor, was it not?

[SAMUEL]:  Yes.

[DEFENSE COUNSEL]: Um, and you're not trained in trajectory, are you?

[SAMUEL]:  No, I'm not. But I understand how a bullet will fly.

[DEFENSE COUNSEL]: Well, that kind of takes some specialized training as well, does it not?

[SAMUEL]:  Yeah, I would agree.

Texas Rule of Appellate Procedure 33.1 requires a timely, specific objection and a ruling by the trial court to preserve a complaint for appellate review. TEX. R. APP. P. 33.1(a). To be timely, a complaint must be made as soon as the grounds for complaint is apparent or should be apparent. *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. 2021).

We review the admission or exclusion of evidence for abuse of discretion. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018); *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). "Under this standard, the trial court's decision to admit or exclude evidence will be upheld as long as it was within the 'zone of reasonable disagreement.'" *Beham*, 559 S.W.3d at 478.

Rule 701 of the Texas Rules of Evidence states, "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; and (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue." In this case, although Lyles argues Samuel's testimony was not rationally based on his perception, he makes no argument regarding whether Samuel's testimony was helpful. "The perception requirement of [rule of evidence] 701 is consistent with the personal

---

[DEFENSE COUNSEL]: Do you have any specialized training?

[SAMUEL]: No.

knowledge requirement of [rule of evidence] 602."[7] *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997).

Based on the record before us, we conclude Lyles failed to timely object to Samuel's testimony regarding trajectory and thus failed to preserve error. *See* TEX. R. APP. P. 33.1(a); *Montelongo*, 623 S.W.3d at 822. Specifically, Lyles waited to object until the second day of Lyles' testimony, after Lyles had already testified, without objection, that he used a laser to try to get a trajectory, "took a pointer lens through some of the existing bullet holes from the interior of the camper to see if [he] could kind of line up and you see where they're coming from," and "used CB antenna through the holes from the outside to kind of figure [it] out."

Moreover, even if we presume for purposes of appeal that Lyles made a timely objection and also presumed that Samuel's testimony constituted an opinion, we conclude his testimony was based on perceptions gained from his own contemporaneous actions and was thus based on his own personal knowledge as required by rule of evidence 701. In *Wade v. State*, 663 S.W.3d 175, 187–88 (Tex. Crim. App. 2022), the court stated:

> Perceptions refer to a witness's interpretation of information acquired through his or her own senses or experiences at the time of the event. Thus, the witness's testimony can include opinions, beliefs, or inferences as long as they are drawn from his or her own experiences

---

[7] Texas Rule of Evidence 602 states:

A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

or observations. An opinion is rationally based on perception if it is one that a reasonable person could draw under the circumstances.

Finally, to the extent Lyles argues Samuel's testimony was harmful because it amounts to improper expert testimony, we reject that argument. *See Cherry v. State*, 488 S.W.2d 744, 756–57 (Tex. Crim. App. 1972) (concluding witness who was not allowed to testify regarding the trajectories of bullets but who was allowed to "explain the strings running from the bullet holes" was "properly allowed to express the methods he had utilized" and stating "the matters about which he was permitted to testify did not constitute expert opinion testimony").

We overrule Lyles's first issue.

## CONCLUSION

We affirm the trial court's judgment.

/Ken Molberg/
KEN MOLBERG
JUSTICE

230383f.u05
Do Not Publish
TEX. R. APP. P. 47.2(b)

–15–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CRAIG EVERETT LYLES,
Appellant

No. 05-23-00383-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 199th Judicial District Court, Collin County, Texas
Trial Court Cause No. 199-83595-2020.
Opinion delivered by Justice Molberg. Justices Nowell and Kennedy participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 28th day of October, 2024.