In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-24-00168-CR

_____

CHRISTOPHER WEISS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 19th District Court
McLennan County, Texas
Trial Cause No. 2018-213-C1

**MEMORANDUM OPINION**

The prior opinion issued by this Court on October 8, 2025, is withdrawn and this opinion is substituted in its place, and the motion for rehearing is denied.

Christopher Weiss was indicted for capital murder of a child under ten years old. Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(8). A jury convicted Weiss, and the trial court sentenced Weiss to the mandatory sentence of life without parole.[1] *See*

---

[1]This case was transferred to this Court from the Tenth Court of Appeals in Waco, Texas, pursuant to a docket equalization order. *See* Tex. Gov't Code Ann. § 73.001.

1

Tex. Code Crim. Proc. Ann. art. 37.071, § 1(a); Tex. Penal Code Ann. § 12.31(a)(2). Weiss appeals the judgment arguing two grounds: (1) the evidence is legally insufficient; and (2) the trial court erred in admitting evidence of internet searches for "poisoning."

The State raised three cross-points on appeal, arguing the judgment should be affirmed but modified to correctly reflect that the trial court, not the jury, assessed Appellant's punishment, to reflect the correct punishment of life imprisonment without parole, to include an affirmative finding of family violence as required by Texas Code of Criminal Procedure article 42.013, and to include an affirmative deadly-weapon finding.

For the reasons stated below, we affirm the trial court's judgment, as modified.

## STANDARD OF REVIEW

### Sufficiency of the Evidence

When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). This standard requires the appellate court to defer "to the responsibility of the trier of fact to fairly

resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. We may not re-weigh the evidence or substitute our judgment for that of the factfinder. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). "The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence." *Villa*, 514 S.W.3d at 232 (citing *Murray v. State*, 457 S.W.3d 446, 448-49 (Tex. Crim. App. 2015)). Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *See Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016) (citing *Jackson*, 443 U.S. at 319); *see also Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007) (Jurors may also draw reasonable inferences from the evidence. "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them."). *Hooper*, 214 S.W.3d at 13, 16. We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution. *See Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). We do so because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). Direct evidence and circumstantial evidence are equally probative, and

3

circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *see also Hooper*, 214 S.W.3d at 13.

We measure whether the evidence presented at trial was sufficient to support a conviction by comparing it to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* The "law as authorized by the indictment" includes the statutory elements of the offense and those elements as modified by the indictment. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000); *see also Swisher v. State*, No. 10-19-00285-CR, 2020 Tex. App. LEXIS 10402, at *5 (Tex. App.—Waco Dec. 30, 2020, pet. ref'd) (mem. op.) (not designated for publication).

Capital Murder of a Child Under Ten

An individual commits capital murder if he intentionally or knowingly murders an individual under ten years of age. Tex. Penal Code Ann. § 19.03(a)(8). "A person acts knowingly, or with knowledge, with respect to a result of his conduct

4

when he is aware that his conduct is reasonably certain to cause the result." *Id*. § 6.03(b). Knowledge is a fact question for the jury and is almost always proven through the circumstances surrounding the crime. *See Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998) (discussing "intent," as inferred from the circumstances); *see also Lee v. State*, 442 S.W.3d 569, 580 (Tex. App.—San Antonio 2014, no pet.) (same). A culpable mental state may be inferred from: (1) the acts, words, and conduct of the accused; (2) the extent of the injuries to the victim; (3) the method used to produce the injuries; and (4) the relative size and strength of the parties. *See Rhymes v. State*, 536 S.W.3d 85, 95 (Tex. App.—Texarkana 2017, pet. ref'd). *See West v. State*, No. 10-15-00326-CR, 2018 Tex. App. LEXIS 5750, at *4 (Tex. App.—Waco July 25, 2018, pet. ref'd) (mem. op., not designated for publication).

Admission of Evidence about Internet Searches for Poison

An appellate court reviews a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *See Montgomery v. State,* 810 S.W.2d 372, 378-79 (Tex. Crim. App. 1990); *see also Henley v. State,* 493 S.W.3d 77, 82-83 (Tex. Crim. App. 2016). So long as the trial court's decision was within the zone of reasonable disagreement and was correct under any theory of law applicable to the case, the decision must be upheld because trial courts are usually in the best position to make the determination as to whether certain evidence should

be admitted or excluded. *See Winegarner v. State,* 235 S.W.3d 787, 790 (Tex. Crim. App. 2007); *see also Montgomery*, 810 S.W.2d at 391. A trial court judge is given considerable latitude on evidentiary rulings. *See Montgomery,* 810 S.W.2d at 378-79. That different trial judges might reach different conclusions on similar facts does not equate to an abuse of discretion. *Id.* We review the trial court's ruling in light of the information before the trial court at the time the ruling was made. *See Hoyos v. State*, 982 S.W.2d 419, 422 (Tex. Crim. App. 1998).

The Evidence

The bodies of "Victoria" and her thirteen-month-old daughter, "Angelique," were found at Tradinghouse Lake Park in Waco on the morning of November 5, 2017.[2, 3] Victoria was found on the ground near the driver's side of her car. She had been shot four times in the head. Angelique, seated in her car seat in the back seat of Victoria's car, had been shot twice in the head.

<u>Testimony of "Kathy"</u>

Kathy testified that she had lived in Waco for seventeen years as of the time of trial. Kathy's father lived in the Waco area, off Elk Road toward Tradinghouse

---

[2]We refer to the victims, their family members, and the civilian witnesses by psuedonyms or familial relationships to conceal their identities. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process"). *See Smith v. State,* No. 09-17-00081-CR, 2018 Tex. App. LEXIS 1874, at *2 n.1 (Tex. App.—Beaumont Mar. 14, 2018, no pet.) (mem. op., not designated for publication).

[3]All dates are 2017 unless otherwise specified.

Lake.[4] Kathy recalled that she and her wife visited Kathy's father on Sundays "[p]robably every week. On the weekends, we'd ride out there and go see him." Kathy and her wife liked to go to Tradinghouse Lake to camp or watch the sunsets. Kathy described the lake at nighttime, when there was no moon, stating "you can't see anything. It's very dark."

When asked about Sunday, November 5, 2017, Kathy testified that she and her wife decided to drive to Tradinghouse Lake just before lunchtime. About five minutes after arriving at the park, they came across a car that was parked so that it was blocking the roadway. Kathy drove closer, stopped about five feet from the car, and she and her wife got out of her truck. Kathy saw a woman on the ground "[n]o further than 10 feet" from the car, and then saw a baby in the back seat of the car. Kathy's wife went to check on the woman near the front of the car and Kathy walked over and opened the back door of the car and saw the baby. Upon looking more closely, Kathy saw that the baby had been shot in the head. Kathy became frightened and told her wife "somebody shot this baby." Kathy and her wife then went back up the road to her truck and backed the truck up to the top of the hill. Kathy called 9-1-1 and the operator directed police to their location. While Kathy and her wife were waiting thirty to forty minutes for the police to arrive, they saw only one vehicle

---

[4]Other testimony showed that the lake area was also known as TP & L, for the electric company facility formerly located there.

leave the park: a red truck that Kathy believed was a Dodge. After the police arrived and surveyed the scene, officers took statements from Kathy and her wife and collected both of the women's fingerprints and DNA swabs. The police also took pictures of Kathy's truck and tires and released the women to leave the scene.

Testimony of Mother

Victoria's mother testified and stated that Victoria was born shortly after Mother moved to Waco in 1992. She said that after Angelique was born, Victoria and Angelique lived with Victoria's cousins, "Aaron," "Daphne," and "Reid," and Mother and Victoria both worked at a local chicken-processing plant.

Mother recalled that "Sophie," Victoria's sister, spent the night at the cousins' home on November 4 and used Victoria's cell phone the next morning to text Mother to pick her up from the cousins' home.

Mother testified that when the police came to her home and told her that Victoria and the baby were found dead at the lake, she knew immediately who was involved because Victoria and "James" (the alias Weiss used) would go to the lake.

Testimony of "Joel"

Joel testified that he was born and raised in Waco and met Victoria when they both worked at the chicken-processing plant in Waco. He began dating Victoria when Angelique was about two months old. Joel said he moved in with Victoria and her cousins at her cousins' home for a "couple of months" before he moved out. Joel

8

testified that at the time of the murders, he was living with another woman who eventually became the mother of his son. He testified that he was with his girlfriend the night of the murders and learned of them the next day.

Testimony of "Jon"

Jon was a friend of Victoria's brother, Isaac. Jon's DNA was found in Victoria's car. Jon explained that Isaac used to borrow Victoria's car and give him rides to and from technical college in the months prior to the murders. Jon was not surprised that his DNA was found in the car.

Testimony of "Ryan"

Ryan testified that at the time of the murders, he and Victoria worked at Sanderson Farms, usually on the 4:30 p.m. to 1:00 a.m. shift. Victoria gave Ryan a ride to and from work each day when they worked together. He kept his work ID badge hanging on the rearview mirror in her car. He was not surprised that his DNA was found in the car.

Testimony of "Claire"

Claire worked with Victoria during the months prior to the murder and visited outside of work with Victoria. Victoria told her Angelique's father was James or Javier Talamantez and showed Claire his photo. Claire was also familiar with the dating website where Victoria said she met Angelique's father. Claire participated in a Waco Facebook group and used the group to try to locate Weiss because Victoria stated that the dating website was the only way she could contact Weiss. Victoria

9

managed to get Weiss' license plate number during one of her meetings with Weiss and Victoria gave the plate number to Claire. Claire posted the information on social media and someone responded to her post with Weiss' name and address. Claire and Victoria then called April Weiss, Weiss' wife, telling her that Weiss had a child by Victoria. During that call, a man's voice came on the line and the call disconnected. Claire assumed that the man's voice belonged to Weiss.

Testimony of "Julie"

Julie grew up with Victoria and she described herself as "best friends" with Victoria. Julie said Victoria was at a mutual friend's house until about 10:00 p.m. on November 4 until Victoria stated that she had to go take Angelique to visit her father so Weiss could spend some time with her. Julie testified she had also formed an account on the same dating app that Weiss was using as "Talamantez" when Claire was trying to locate him for Victoria. She said she was able to get Weiss to respond to her messages even though he was blocking Victoria.

Testimony of "Jordyn"

Jordyn testified that she was friends with Julie, who used to live with her, and friends with Victoria because she and Julie used to help babysit Angelique. Jordyn said that on the night of November 4, Victoria came to her house, and they did Victoria's makeup because Victoria was "gonna go meet my baby daddy."

Testimony of "Sophie"

Sophie, one of Victoria's younger sisters, was fifteen years old when she testified. Sophie said she was nine years old on the day of the murders. Sophie confirmed that she, Anna, Victoria, and Angelique spent Saturday evening at Jordyn's house before dropping Anna at her mother's house and arriving at Victoria's house. When riding in Victoria's car, Sophie always sat in the back seat behind the driver and Angelique always sat in her car seat in the middle of the back seat. Sophie said a "white guy" was at Victoria's home standing next to a white pickup truck when they arrived. She continued that Victoria took the baby and the "white guy" into her bedroom for a while and then Victoria and the "white guy" left. Before leaving, Victoria gave her phone to Sophie and told Sophie that she and the "white guy" were going to the lake. The "white guy" left in his truck and Victoria followed him in her own car, with Angelique in the baby seat.

Testimony of "Reid"

Reid was Victoria's cousin and he was twenty-one years old when the murders happened. He and his younger brother, Aaron, lived in the home with Victoria and Angelique in November 2017. Reid testified that Weiss came to the house around 4:00 or 5:00 p.m. that Saturday looking for Victoria. After Reid told Weiss that Victoria was at their grandmother's house, Weiss left. Weiss later returned to Reid's house around midnight at the same time Victoria arrived. Sophie, Victoria,

11

Angelique, and Weiss entered the house at the same time.

Reid believed Victoria and Weiss were arguing after they went into the bedroom, so he, Reid, went to Victoria's room to ask whether everything was all right. Victoria responded "yeah." Victoria said something about going to the park and asked Reid whether he wanted to go. Reid said he told her "no, 'cause it's already late" and went to his bedroom. After about half an hour, Weiss and Victoria went outside to the vehicles. Reid said Victoria and Weiss started fighting again. Reid said he heard Victoria crying and Weiss swearing at her. Weiss was telling Victoria "we need to hurry and f[…] go and stuff like that." Victoria complained about needing to put Angelique in the car seat in case there was an accident. Victoria asked Weiss, "You really want the baby to go flying and die?" Reid heard Weiss respond "I don't give a f[…]. Just hurry up and go." Reid also said he heard Victoria say "[l]eave the baby alone…don't hit her like that." Reid went outside to see about the arguing and Victoria and Weiss stopped and acted as though nothing was wrong.

Reid also testified that he had heard Victoria and Weiss argue in the past when Weiss would tell Victoria that he did not want to be with her. Yet, at other times it appeared that Weiss wanted to leave his wife and be with Victoria. According to Reid, Weiss and Victoria would argue for up to three hours and Weiss would accuse Victoria of cheating on him with other men. Reid had heard Weiss call Victoria a wh[…] during one of their arguments in the weeks leading up to the murders. Reid

12

said he saw Victoria leave in her car, with Angelique in her car seat, that night following Weiss in his truck. That was the last time Reid saw Victoria alive.

Testimony of "Aaron"

Aaron is Reid's younger brother. When Aaron was about nineteen years old, he lived in the home with their cousin, Victoria. Aaron said Victoria moved in with them when Angelique was about two months old. He said Weiss would come to visit Victoria and Angelique about every other weekend. When Weiss visited Victoria and Angelique they would usually "chill" at the house.

Testimony of "Julian"

Julian testified that he took his wife and son fishing at the lake around 10:00 p.m. on the night of November 4, 2017. After he heard about the murders, he called the police to report what he had seen that night. While Julian and his family were at the lake, he saw what were later identified as Weiss' and Victoria's vehicles pass by them and go about one-half a mile down the road to a very dark place on the lake. After that, Julian did not see or hear anything from that direction before he and his family left to go home around 3:00 a.m.[5]

---

[5]Since daylight saving time ended at 2:00 on the morning of November 5, 2017, Julian and his family technically left the lake at 2:00 a.m. Central Standard Time.

Testimony of "Jason"

Jason, who is a cousin of Weiss, was called as a defense witness. Jason testified that Weiss, his wife, and their two children moved into a bedroom in Jason's home on November 1, 2017, because Weiss was losing his own house. Jason testified that Weiss was having financial problems. Weiss had shown Jason a .22 caliber pistol when the two of them were in the bedroom and Jason offered to buy it from him. Weiss declined to sell the gun and later told Jason that it went missing from his truck.

Testimony of Deputy Matthew Glover

Deputy Glover testified that he has worked for the McLennan County Sheriff's Department since 2013. On November 5, 2017, the Sunday that the bodies were discovered, Glover was dispatched to the scene at the lake. During the investigation, crime scene technicians photographed the bodies, the vehicle, and the scene. As the investigation continued, Glover lent his county-issued digital camera to the helicopter team and that team took aerial photos of the scene that day. Glover identified these photographs. Glover testified that there was only "one way in and one way out" of the park for "regular" vehicles, as distinguished from ATVs or dirt bikes. Glover also testified that as part of his job, he has made numerous visits to next-of-kin in order to provide notice of death. He testified that people react differently to death notifications, stating "[s]ome [] don't show any kind of emotion. Some get hysterical and start breaking down and crying."

14

Testimony of Forensic Pathologist, Dr. Jill Urban

Jill Urban, M.D., testified that in 2017, she worked as a forensic pathologist for the Dallas County Medical Examiner's Office.[6] Dr. Urban supervised Victoria's autopsy and attended Angelique's autopsy and concluded that each of the deaths was caused by gunshot wounds to the head at close range, "[r]oughly, a foot" away. Dr. Urban further concluded that the manner of Victoria's and Angelique's deaths was homicide.

Testimony of Texas Ranger Jake Burson

Ranger Jake Burson ("Burson") testified that he had worked as a Texas Ranger for fourteen years at the time of trial. Shortly after Victoria's and Angelique's bodies were discovered, Burson was called to the crime scene to assist the McLennan County Sheriff's Department. At the scene, Burson collected evidence, including fingerprints from the car, a projectile found in the back seat of the car, and DNA samples from the outside car door handles and blankets. Burson later interviewed Weiss and other witnesses. Burson also said he retrieved partially smoked cigarettes and butts found on the ground near Victoria's body, close to the car.

After speaking to some of Victoria's family members, Burson learned that Weiss had visited Victoria the night of November 4. Burson testified that he spoke

---

[6]Dr. Urban testified that the Dallas County Medical Examiner's Office is also known as the Southwestern Institute of Forensic Sciences.

15

to Weiss, who was requested to come to the Sheriff's Office on the day the bodies were discovered, November 5. Burson said Weiss came to the office with his wife and two children and Burson and Weiss had a private conversation, away from Weiss' family members. That interview lasted about four hours and was videotaped. When the interview ended, Weiss and his family left.

According to Burson's recollection of that initial interview, Weiss admitted to having an affair with Victoria about a year earlier and further acknowledged that Victoria had a child, but Weiss was not sure he was the child's father. Burson said Weiss told him that the birth of the child had brought a lot of adversity into his life, that he was having financial problems because he lost his job, and it caused a lot of problems between his wife and himself. Burson said Weiss denied that he had ever touched or been inside Victoria's vehicle and also denied that his DNA would be in the vehicle. When Burson asked Weiss when he last saw Victoria, Weiss indicated something to the effect that it was "the other night." Burson said he specifically directed Weiss to the previous night, November 4, and Weiss admitted he had seen Victoria at her house at that time. Burson said Weiss told him he waited for Victoria for some time and she finally arrived home when he was there waiting for her at about 10:00 p.m. on November 4. Burson said he finally told Weiss that the reason he asked him to come in for questioning was because Victoria and Angelique were dead for which "there wasn't much of a reaction." He said Weiss told him he thought

16

something like that had happened—possibly to one of his family members. Weiss was requested, and agreed, to give a DNA sample and, when asked about his cell phone, volunteered to turn his cell phone over for a cell phone extraction and data analysis.

Upon further questioning, Weiss said he owned several guns and had recently lost, or had stolen, a .22 caliber pistol that he had bought for his wife. Burson later visited Rodeo Pawn Shop, in Waco, and obtained records showing that Weiss had purchased a .22 caliber Blue Steel revolver on January 10, 2015. Burson testified, through presentation of the recorded interview, that Weiss said the day his wife found out about Angelique was "the day my life fell apart." Burson said he took a buccal swab to get a DNA sample from Weiss. Burson said that early in his interview with Weiss, Weiss denied that he had gone to Tradinghouse Lake with Victoria on the night of November 4. Burson also noted that the clothing Weiss wore to the interview was different from the clothing Weiss had worn the night of November 4 when Weiss was videotaped at Walmart. Burson later testified that he had Weiss draw a picture in his second interview, after *Miranda* rights were given, of where Weiss' truck was parked and where Victoria's car was parked when Weiss and Victoria were at the lake. Burson testified that Weiss' drawing closely matched the locations where Victoria's vehicle was found parked when the murders were discovered.

When asked to compare differences between the first and second recorded interviews he made with Weiss, Burson noted the following differences:

In the first interview, Weiss stated that he left Victoria's house, went home, tried to make a surprise visit back to Victoria's but could not find her, and never went to the lake. In the second interview, Weiss stated Victoria followed him to the lake and after he and Victoria spent time there, Weiss left Victoria at the lake and drove around for a while before going home.

In the first interview, Weiss said he stopped for a while at the Brazos River before he went home that night. In the second interview, however, Weiss said he went to Lake Belton for about forty minutes after he left Tradinghouse Lake. Weiss' cell phone records confirmed that he was near Lake Belton at the time in question.

Testimony of Captain Chris Eubank

Chris Eubank ("Eubank") testified that in November 2017, he was a patrol captain with the McLennan County Sheriff's Office.

Although Eubank was called to the crime scene on November 5, his involvement with the investigation was "very minimal" that day, and he did not pick up any evidence. On November 7, the chief deputy, David Kilcrease, requested Eubank to accompany him to Temple to "sit on a house" while other officers obtained an arrest warrant for Weiss. Eubank and Kilcrease therefore took a county vehicle to Temple, and parked "150, 200 yards at least from the house" where Weiss

18

was staying at that time. From that vantage point, Eubank and Kilcrease saw a man they believed to be Weiss put things in the back of his pickup truck and leave the house. Eubank and Kilcrease followed Weiss. According to Eubank, Weiss initially drove "normal," but when Weiss realized that the officers were following him, "he was picking up speed. And you could see that he was weaving in and out of traffic. . . . Obviously, he knew that we were there. And that he was, you know, trying to get away from us." When Eubank and Kilcrease saw Weiss enter a parking lot at the Temple municipal buildings, they pulled behind Weiss' truck as other officers arrived and took Weiss into custody.

Testimony of Joyce Marek

Joyce Marek was working as a crime scene technician for the Waco Police Department at the time of the murders. In November 2017, Marek processed Victoria's turquoise Ford Focus for fingerprints and DNA evidence after the vehicle was taken to the crime lab. An expended bullet projectile was found in the back seat of Victoria's vehicle at the scene.

Marek also assisted in searching Weiss' truck at the crime lab. In that vehicle, Marek found an unloaded .45 caliber pistol in the driver's door pocket and a safe in the back of the pickup. Marek found the children's birth certificates and various clothing, among other things. Marek also located a .308 caliber rifle, ammunition, a long-range scope, and a bow and arrow.

19

Testimony of Serena Zboril

In November 2017, Serena Zboril was working as a forensic scientist in the DNA section of the Texas Department of Public Safety Crime Lab in Waco. Zboril explained the DNA testing results established that Weiss was a possible contributor to DNA found on Victoria's car keys and Victoria's black pants. Zboril also said Weiss could not be excluded as a contributor to DNA found on the back left interior door handles and buttons of Victoria's car (because it had limited support for exclusion).

Testimony of Courtney Ferreira

Courtney Ferreira ("Ferreira") testified that she was a DNA analyst in the Forensic Biology Unit at the Southwestern Institute of Forensic Sciences. After explaining how DNA testing can identify a child's father, Ferreira testified that she obtained DNA from Weiss, from Victoria, and from Angelique to determine Angelique's paternity. "Christopher Weiss was included as being the biological father of [Angelique]." In fact, according to Ferreira, "[i]t's 138 billion times more likely that Christopher Weiss contributed and is the father than if a randomly selected individual is the father."

Testimony of Dustin Losak

Dustin Losak ("Losak") was working as an investigator with the McLennan County Sheriff's Office in November 2017. Investigator Losak obtained and

reviewed Weiss' Facebook posts. In October 2017, Weiss posted that he loved his wife, but at the same time, Weiss was messaging Victoria about his future relationship with Angelique. Losak also explained, through video from a Walmart about ten minutes from Victoria's house, that Weiss was attempting to go to Victoria's house on Saturday, November 4, 2017, and attempting to meet Victoria that day. Losak pointed out records of Facebook messages between 7:00 p.m. and 10:00 p.m. on November 4, 2017, in which Weiss was attempting to arrange a meeting with Victoria.

Losak then went through Weiss' deleted cell phone entries and explained what was recovered regarding internet searches for methods of poisoning people. Losak said the records showed searches for "boil potatoes in rubbing alcohol," "solanine poison" and "solayene poison," "how to make rotten meat poison," "Bow (sic) to make fatal poison," "how to make deadly poisons at home," "how to extract cyanide from apricot seeds," and "how many peach seeds can kill you." Those searches had all been made just after 11:00 p.m. on October 26, 2017—nine days before the evening of the murders but were later deleted. Losak also pointed out deleted searches seeking an address for Victoria's friend, Claire, who had been trying to contact Weiss on Victoria's behalf.

Losak then identified cell tower data that had been deleted at approximately 3:00 a.m. on November 5, 2017, the early morning hours near the time of the

21

murders. Losak also testified about a test-drive he made from Victoria's house to the location on the lake where the bodies were found. Losak recalled that the trip took him just over twenty-nine minutes.

Finally, Losak testified to security video from a car dealership near the lake. This recording showed Weiss' and Victoria's vehicles heading toward the lake at 12:50 a.m. on November 5, 2017, and then showed only Weiss' truck traveling in the opposite direction, away from the lake, at 1:27 a.m. on the same date. Losak was able to infer from the location data that Weiss' phone was by the lake at 12:56 a.m. on November 5, 2017, near the time of the murders.

Testimony of Jeffrey Kelly

Jeffrey Kelly ("Kelly") worked as a firearms and toolmark examiner for the Texas Department of Public Safety Crime Lab. Kelly testified the .22 caliber gun Weiss purchased in 2015 at Rodeo Pawn, as shown by the purchase receipt, was capable of firing .22 long caliber shells. The way that gun fired required the shooter to empty the chambers of the spent casings after firing so that he could empty the casings into his hands and leave no spent casings at the scene.

## ANALYSIS

### Sufficiency of the Evidence of Capital Murder of a Child Under Ten

In his first issue, Weiss challenges the sufficiency of the evidence to support his conviction for capital murder of a child under ten. An individual commits capital

22

murder if he intentionally or knowingly murders an individual under ten years of age. Tex. Penal Code Ann. § 19.03(a)(8). "A person acts knowingly, or with knowledge . . . of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id*. § 6.03(b). Weiss does not deny that Victoria and Angelique were murdered by being shot in the head. Weiss argues that the evidence is insufficient to identify him as the murderer because the circumstantial evidence is not sufficient as a matter of law. For us to determine this issue, this Court must consider the cumulative force of all the evidence. *See Villa*, 514 S.W.3d at 232. "In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." Tex. Code Crim. Proc. Ann. art. 38.36(a).

Weiss contends that the evidence is insufficient in five areas: (1) motive, including marital/relationship difficulties, (2) opportunity, (3) the prior behaviors of a defendant, (4) inconsistencies in the defendant's story, and (5) a catch-all of other circumstantial evidence.

A review of the evidence shows the jury heard evidence about the relationship Weiss had with Victoria and Angelique. Victoria's cousin, Reid, testified that he had heard Victoria and Weiss argue in the bedroom and again in the driveway on the

23

night of the murders. Reid said that in the past, Weiss would tell Victoria that he did not want to be with her, that they would argue for up to three hours sometimes, and Weiss would accuse Victoria of cheating on him with other men. Reid had heard Weiss call Victoria a wh[…] during one of their arguments in the weeks leading up to the murders. Weiss himself told Ranger Burson that the day his wife found out about Angelique was "the day my life fell apart." Weiss also told Ranger Burson that on the night of the November 4 meeting between himself and Victoria, he told Victoria "I don't want my wife to know I'm still messing—doing stuff." Weiss was afraid that his relationship with Victoria was going to cause his wife to leave him.

The State, though not required to show motive,[7] established a motive for Weiss to want to murder Victoria and Angelique and that is one kind of evidence to aid the jury in establishing proof of the offense. *See Crane v. State* 786 S.W.2d 338, 349-50 (Tex. Crim. App. 1990) (citing *Porter v. State*, 623 S.W.2d 374, 386 (Tex. Crim. App. 1981) (admission of evidence that the defendant shot the victim to avoid being apprehended for an armed robbery that the defendant committed eleven days earlier)).

That is not the only evidence of Weiss' motive. Weiss' cousin, Jason, said Weiss and Weiss' family moved into a bedroom in Jason's home on November 1,

---

[7]Motive is not an element of the crime of murder. *See* Tex. Penal Code Ann. § 19.02(b)(1); *see Ingerson v. State*, 559 S.W.3d 501, 510 (Tex. Crim. App. 2018).

24

2017, because Weiss was losing his own house and was having financial problems. According to Facebook messages Weiss exchanged with Victoria, Weiss was concerned that Victoria would seek child support from him if she pursued a paternity claim against him at a point in time when Weiss did not even have enough money for gas. *See Sanders v. State*, No. 01-07-00775-CR, 2009 Tex. App. LEXIS 2561, at *24-26 (Tex. App.—Houston [1st Dist.] Apr. 2, 2009, pet. ref'd) (Evidence that the defendant did not want his girlfriend to discover that he had impregnated another woman and did not want to pay child support were evidence of his motive to commit murder.). There was evidence of Weiss' motive to murder Victoria and Angelique upon which the jury could have based its verdict. *Id*.

There is also evidence that Weiss had opportunity to commit the murders that night. Here, the evidence at trial showed that Appellant's DNA was found inside Victoria's vehicle at the scene of the murders and on her clothing. In addition, cell phone records reveal that Weiss and Victoria were in contact on the day she died. Cell phone records place Appellant in close proximity to Victoria and Angelique at the time of their deaths, although the records cannot pinpoint Weiss' exact location at the time of the murders. The cell phone records show that Weiss and Victoria were conversing in the hours before the murders. Reid and other family members testified that Weiss met Victoria at the house the night of November 4, went into her room with her, and then both left after saying they were going to the lake where the bodies

25

were later found.

Reid saw Weiss leave with Victoria and Angelique following him in Victoria's car. Weiss was the last person seen with Victoria and Angelique when they were alive. Reid testified about the prior behavior of Weiss when Weiss and Victoria would argue about whether Weiss wanted to be with Victoria or stay with his wife. Reid said that on the night of the murders, Weiss sounded angry to the point that Reid went outside to see whether Weiss and Victoria were fighting. But Weiss and Victoria quickly quieted down and acted as though they were not angry. The behaviors Reid described provided the jury with evidence that Weiss' anger at Victoria may have motivated Weiss to commit the murders.

Since Weiss was charged with and convicted of murdering Angelique, rather than Victoria, we further observe that Weiss' behavior toward Angelique was not that of a protective father. Specifically, Weiss referred to Angelique as "the child" or "it" when speaking with Burson. Weiss also was overheard stating that he did not care if Angelique were killed in a car accident. Since Reid heard Victoria tell Weiss not to hit Angelique, the jury reasonably could have inferred that Weiss was striking his child in a way that showed he did not care about her.

Weiss is the undisputed father of Angelique based upon the DNA evidence admitted without objection at trial. There was evidence that Weiss admitted that he did not want his wife and his family to find out that he had a sexual relationship and

26

a child with Victoria. There was evidence Weiss was concerned about having to pay child support payments for Angelique. Finally, the jury heard evidence that Weiss lied to police and gave different versions of his actions on the night of the murders. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt.) (internal citation omitted). Weiss offered no alibi witnesses to corroborate his account of his whereabouts and movements on the night of the murders. In fact, near the time of the murders, Weiss' and Victoria's vehicles were recorded going in the direction of the lake and later, only Weiss' vehicle was recorded leaving from the direction of the lake. Although Weiss attempted to explain this evidence by claiming that he left Victoria and Angelique alive at the lake, the jury need not have credited this statement. Instead, the jury could have accepted the State's theory of the case: Victoria's car did not leave the lake area with Weiss because Victoria and Angelique were already dead.

The jury heard evidence of Weiss' erratic driving when he left the house he shared with his cousin, and could have interpreted this evidence, as Eubank did, as showing Weiss' attempt to avoid arrest. Since "[e]vidence of flight . . . shows a consciousness of guilt of the crime for which the defendant is on trial[]" the jury could have construed this evidence meaning Weiss was guilty. *Bigby v. State*, 892

27

S.W.2d 864, 884 (Tex. Crim. App. 1994) (citations omitted).

In a similar case, the Court of Criminal Appeals considered a murder conviction based on circumstantial evidence. *See Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018). In *Ingerson*, as here, the murder weapon was never found. When Ingerson told police he "sold [a particular gun] to a 'Mexican' he met on a South Padre Island Beach[,]" the jury did not have to accept that explanation at face value. *Id*. at 510. Weiss' jury likewise did not have to believe that Weiss' missing gun disappeared from his truck and may have been stolen at Walmart, as Weiss claimed. The *Ingerson* court considered Ingerson's motive to kill his victims, his "avoidance of the police," his statement to an acquaintance, his opportunity to commit the murders, and his conduct afterward, and concluded that the circumstantial evidence, when "viewed in the light most favorable to the verdict," was sufficient to support the verdict. *Id*. at 511.

Similarly, here the evidence showed Weiss had previously purchased a .22 caliber pistol which an expert testified was capable of firing the kind of shots that killed Victoria and Angelique. Weiss' cousin confirmed that he had seen Weiss with the .22 caliber pistol some time prior to the murders and he had offered to buy it from Weiss. While it is true that there were no eyewitnesses to the crime, no murder weapon was recovered, and there was DNA from other persons who had spent time in Victoria's car, considering all of the evidence in the light most favorable to the

28

verdict, we conclude that a rational jury could have found Weiss guilty of the essential elements of the crime beyond a reasonable doubt. *See Winfrey v. State*, 323 S.W.3d 875, 878–79 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 319). "[T]his was not a determination so outrageous that no rational trier of fact could agree." *See Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012). We overrule Weiss' first issue.

Admission of Internet Searches for Poison

In his second issue, Weiss argues that the trial court reversibly erred by admitting evidence that Weiss had made internet searches about how to make poison, searches which were deleted in the days prior to the murders. Investigator Losak testified that a search of Weiss' phone records showed searches for "boil potatoes in rubbing alcohol," "solanine poison" and "solayene poison," "how to make rotten meat poison," "Bow (sic) to make fatal poison," "how to make deadly poisons at home," "how to extract cyanide from apricot seeds," and "how many peach seeds can kill you." Weiss made timely objections that the evidence was not relevant and was more prejudicial than probative.[8] Rule 401 states that relevant evidence is any evidence that tends to make a fact more or less probable than it would be without the evidence

---

[8] Weiss' counsel objected on the ground that this evidence was not relevant and that any relevance this evidence might have is "substantially outweighed by the prejudicial effect of such evidence." The trial court overruled the objection, citing article 38.36, subpart a. *See* Tex. Code Crim. Proc. Ann. art. 38.36(a).

and is consequential in determining the action. Tex. R. Evid. 401. If the evidence provides even a small nudge toward proving or disproving a fact of consequence, it is relevant. *See Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). However, relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, causing undue delay or it is needlessly cumulative. Tex. R. Evid. 403. To violate Rule 403, it is not enough that the evidence is "prejudicial"—it must be unfairly prejudicial. *Vasquez v. State,* 67 S.W.3d 229, 240 (Tex. Crim. App. 2002).

The searches were made on October 26, 2017—nine days before the evening of the murders. The searches were subsequently deleted. Losak also pointed out other deleted searches Weiss made when he was searching for an address for Victoria's friend, Claire, one of the people who called Weiss' wife on the phone. The trial court ruled that the evidence of the searches and deletions was admissible under article 38.36(a) which provides "in all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." Tex. Code Crim. Proc. Ann. art. 38.36(a).

30

While Weiss is factually correct that Victoria and Angelique were shot, not poisoned, the trial court could have reasonably concluded that the evidence of his searches regarding poison was relevant to show the "condition of the mind" of Weiss shortly before the murders were committed, which is expressly permitted by article 38.36(a). *Id.* The evidence tends to establish Weiss' state of mind that he wanted to kill someone—albeit by poisoning rather than by shooting with a gun. We cannot say the trial court abused its discretion in overruling the objections. *Id.*; *see Winegarner,* 235 S.W.3d at 790; *Montgomery*, 810 S.W.2d at 291.

Weiss further objected that the evidence was so prejudicial to his case that the admission of the poison searches substantially outweighed its probative value. We must consider whether the evidence of the poison searches had a tendency to suggest that the jury decide the case on an improper basis, such as an emotional one. *See Rogers v. State*, 991 S.W.2d 263, 266 (Tex. Crim. App. 1999). While all relevant evidence may be prejudicial to one side or the other, the question is whether there is a "clear disparity" between the degree of prejudice compared to its probative value. *See Joiner v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992). We analyze a Rule 403 objection by balancing the inherent probative force of the evidence, along with the proponent's need for the evidence, against the tendency to suggest a decision on an improper basis, to confuse or distract the jury, to cause the jury to give undue weight to the evidence, or to be repetitive or inordinately time consuming. Tex. R.

31

Evid. 403; *see Gigliobianco v. State,* 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). In response to the prejudice objection, the prosecution contends it had great need for the evidence because Weiss had told Ranger Burson during his interview that he had "no friction" with Victoria, that he and Victoria never argued or had disagreements, and that he had no motive to kill Victoria or Angelique. While Reid testified that he heard arguments between Weiss and Victoria on more than one occasion, including the night they left the house to go to the lake, Weiss contended that there was no evidence that these arguments rose to the level of wanting to commit murder. The evidence of Weiss' internet searches about how to make poison show Weiss' state of mind and that his relationship with Victoria was getting to the point that he was actively considering ways to kill her. The fact that the searches were deleted before Weiss relinquished his phone to the police for analysis was also probative because evidence that an actor hid or attempted to hide evidence is admissible to infer scienter (guilty knowledge). *See Guevara*, 152 S.W.3d at 50. The State demonstrated this evidence was necessary to show the relationship between Weiss and Victoria was not friendly and without friction as Weiss had described it to Ranger Burson. The admission of the evidence was neither confusing, nor did it suggest that the jury should decide the case on an improper basis. The presentation of the challenged evidence was relatively brief, was not cumulative or repetitive, and its admission was within the sound discretion of the trial court. *See Henley v. State,*

32

493 S.W.3d at 82-83. We conclude the trial court did not err by admitting the evidence. Because the evidence was properly admitted, we need not conduct a harm analysis. Tex. R. App. P. 44.2(b), 47.1. We overrule Weiss' second issue.

## CROSS-POINTS BY THE STATE

In three cross-points of error brought by the State, the State urges that the judgment entered in this case is incorrect because: 1) the punishment was assessed by the judge, and not the jury, and the place of confinement fails to state that the mandatory life sentence is "without parole;" 2) the judgment fails to include an affirmative finding of family violence; and 3) the judgment fails to include a finding that a deadly weapon was used in the commission of the offense. *See* Tex. Penal Code Ann. § 12.31(a)(2); Tex. Code Crim. Proc. Ann. art. 42.013.

Appellant filed no reply to the State's cross-points. We have the power to modify a judgment to speak the truth when we have the necessary information to do so. Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993). A review of the record indicates that the trial judge pronounced the life sentence without parole from the bench, stating: "your punishment is assessed at life imprisonment without the possibility of parole." When the oral pronouncement of sentence and the written judgment vary, the oral pronouncement controls. *See Ex parte Madding*, 70 S.W.3d 131, 135 (Tex. Crim. App. 2002) (citing *Coffey v. State*, 979 S.W.2d 326, 328 (Tex. Crim. App. 1998)). Therefore, we sustain the State's first

33

cross-point.

The State's second cross-point seeks to enforce article 42.013 of the Code of Criminal Procedure regarding a finding of family violence because the undisputed trial evidence showed that Angelique was Weiss' biological child. *See* Tex. Code Crim. Proc. Ann. art. 42.013. Article 42.013 states that "[i]n the trial of an offense under Title 5, Penal Code, if the court determines that the offense involved family violence, as defined by Section 71.004, Family Code, the court shall make an affirmative finding of that fact and enter the affirmative finding in the judgment of the case." Tex. Fam. Code Ann. § 42.013. To determine whether an offense involved family violence, we look to the Family Code and the Government Code. Section 71.004 of the Family Code defines family violence, in part, as "an act by a member of a family or household against another member of the family or household that is intended to result in physical harm [or] bodily injury[.]" *Id*. § 71.004(1). According to the Family Code, a "Family" includes individuals related by consanguinity pursuant to Government Code section 573.022, without regard to whether those individuals reside together. *See id*. § 71.003; Tex. Gov't Code Ann. § 573.022. The Government Code then defines "consanguinity," stating that two people are related by consanguinity if one is a descendant of the other. Tex. Gov't Code Ann. § 573.022(a)(1). Since the trial evidence established family violence under these definitions, the trial court was required to make a family-violence finding in the

34

judgment. We sustain the State's second cross-point.

The State's third cross-point complains that the judgment does not contain a finding that a deadly weapon was used in the commission of the offense. A finding that appellant was found guilty of the offense "as alleged in the indictment" is sufficient to authorize the entry of a deadly-weapon finding. *See Duran v. State*, 492 S.W.3d 741, 746 (Tex. Crim. App. 2016) (explaining that one way in which "a court can determine that the trier of fact actually made an affirmative finding of a deadly weapon" is when "the indictment specifically alleged a 'deadly weapon' was used [using the words 'deadly weapon'] and the defendant was found guilty "as charged in the indictment"). In this case, the indictment read, in relevant part, that Weiss caused the death of the child, "by shooting the Deceased with a firearm, a deadly weapon…." Additionally, the jury charge included instructions and definitions regarding the offense as alleged in the indictment and instructed that "'Deadly weapon' means a firearm …," and the charge's application paragraph for capital murder included:

> You must determine whether the State has proved, beyond a reasonable doubt the elements. The elements are that:
>
> 1. The Defendant, Christopher Weiss;
> 2. in McLennan County, Texas;
> 3. on or about the 5th day of November, 2017;
> 4. did then and there intentionally or knowingly cause the death of [Angelique], an individual hereinafter called the Deceased;

5. by shooting the Deceased with a firearm, a deadly weapon; and

6. The Deceased was under ten years of age.

In the jury's verdict the jury concludes: "We, the jury, find the Defendant, Christopher Weiss, guilty of the offense of Capital Murder, as alleged in the indictment." Therefore, the jury made an affirmative finding that a deadly weapon was used, and we sustain the State's third cross-point and order the judgment reformed accordingly.

## CONCLUSION

Having overruled both of Appellant's issues, we affirm the judgment of the trial court, as modified. We order the judgment to be modified to include language that the punishment was assessed by the Judge, the place of confinement states that the mandatory life sentence is "without parole," that the judgment includes an affirmative finding that Weiss is guilty of committing family violence, and that the judgment contains a finding that a deadly weapon was used in the commission of the offense.

AFFIRMED AS MODIFIED.

JAY WRIGHT
Justice

Submitted on September 11, 2025
Opinion Delivered October 22, 2025
Do Not Publish

Before Johnson, Wright and Chambers, JJ.

36